# IN THE SUPREME COURT OF CALIFORNIA

SUNDAR NATARAJAN,
Plaintiff and Appellant,

v.

DIGNITY HEALTH,
Defendant and Respondent.

S259364

Third Appellate District
C085906

San Joaquin County Superior Court
STK-CV-UWM-2016-4821

August 12, 2021

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Cuéllar, Groban, and Jenkins concurred.

NATARAJAN v. DIGNITY HEALTH

S259364


Opinion of the Court by Kruger, J.


Under California's peer review statute, a hospital must afford a physician a fair hearing before revoking the physician's staff privileges. (Bus. & Prof. Code, § 809 et seq.) A panel of the physician's peers generally serves as the trier of fact at these proceedings. Proceedings before a peer review panel may be conducted by a hearing officer who makes evidentiary and procedural rulings, but who may not vote on the merits. To ensure impartiality, the statute provides that neither panel members nor hearing officers may gain a "direct financial benefit from the outcome." (Bus. & Prof. Code, § 809.2, subds. (a) & (b).)

The question in this case is whether a person hired by a hospital to serve as a hearing officer may be disqualified for financial bias under Business and Professions Code section 809.2, subdivision (b), on grounds that the officer has an incentive to favor the hospital in order to increase the chances of receiving future appointments. The Court of Appeal in this case answered no. We reach a different conclusion. While a hearing officer's interest in future employment is not automatically disqualifying, neither is it categorically beyond the reach of the statute. In some cases, depending on the circumstances, the hearing officer's financial interest in currying favor with the hiring entity may create an intolerable risk of bias requiring disqualification under the statute. But

1

because the record does not establish this is such a case, we affirm the judgment of the Court of Appeal.

## I.

## A.

In California, hospitals are composed of an administrative governing body that oversees hospital operations and a medical staff that provides medical services and ensures its members provide adequate medical care to patients. A physician who wishes to practice at a hospital must maintain staff privileges. The termination of staff privileges can significantly limit the physician's ability to practice medicine. For that reason, before staff privileges can be terminated, the physician must be afforded certain procedural protections, including the opportunity for review of the termination decision. (*El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976 (*El-Attar*); Cal. Code Regs., tit. 22, § 70703, subd. (a).)

Hospital peer review originated as a purely voluntary process for handling recommendations to suspend or terminate physician staff privileges, but by now has become firmly embedded in California law. For decades before the peer review statute was enacted in 1989, California courts had held that hospitals must provide certain protections to physicians facing the denial of staff privileges. For private hospitals like St. Joseph's Medical Center of Stockton, the obligation was rooted in the common law doctrine of fair procedure, which applies to the membership decisions of certain private organizations affecting the public interest. (*El-Attar*, *supra*, 56 Cal.4th at pp. 986–987, citing, inter alia, *Anton v. San Antonio Community Hosp.* (1977) 19 Cal.3d 802; see, e.g., *Kaiser Foundation Hospitals v. Superior Court* (2005) 128 Cal.App.4th

85, 102; *Applebaum v. Board of Directors* (1980) 104 Cal.App.3d 648, 657 (*Applebaum*).) Fair procedure required hospitals to afford physicians certain fundamental procedural protections, including adequate notice and an opportunity to be heard before an impartial decision maker. (*El-Attar*, at pp. 986–987; *Applebaum*, at p. 657.)

When the Legislature enacted the peer review statute in 1989, it both codified the peer review process and made peer review "part of a comprehensive statutory scheme for the licensure of California physicians." (*Mileikowsky v. West Hills Hospital & Medical Center* (2009) 45 Cal.4th 1259, 1267 (*Mileikowsky*); see Bus. & Prof. Code, § 809 et seq.) The two primary goals of the peer review statute are "to protect the health and welfare of the people of California by excluding through the peer review mechanism 'those healing arts practitioners who provide substandard care or who engage in professional misconduct' " and "to protect competent practitioners from being barred from practice for arbitrary or discriminatory reasons." (*Mileikowsky*, at p. 1267.)

The bulk of the peer review statute's requirements are aimed at private hospitals, like the hospital at issue in this case. (See Bus. & Prof. Code, § 809.7.) Under these provisions, when the peer review body — often a hospital medical staff committee — recommends denying, revoking, or otherwise restricting a physician's staff privileges for reasons of professional performance, the physician may request a hearing. (*Id.*, § 809.1; see *id.*, §§ 805, subd. (a)(1)(B)(i), 809, subd. (b) [defining "peer review body"].) The hearing shall take place before a trier of fact who is either (1) an arbitrator or arbitrators selected through a mutually acceptable process, or (2) a panel of fellow practitioners including, where feasible, a member who

practices the same specialty as the physician. (*Id.*, § 809.2, subd. (a) (section 809.2(a)).)

When the hearing is held before a peer review panel, a hearing officer may be appointed to preside. (Bus. & Prof. Code, § 809.2, subd. (b) (section 809.2(b)).) Unlike the members of the panel, the hearing officer need not be a medical practitioner; often the hearing officer is a lawyer.[1] If a hearing officer is selected, the hearing officer is tasked with making procedural and evidentiary decisions, including ruling on requests for access to information, requests for continuances, and challenges to the impartiality of the panel members or hearing officer. (*Id.*, § 809.2, subds. (c)–(h).) The hearing officer may not, however, vote on the outcome; the ultimate decision is left exclusively to the panel. (*Id.*, §§ 809.2(b), 809.4, subd. (a)(1).)[2]

The statute provides that hearing officers and panel members alike "shall gain no direct financial benefit from the outcome." (§ 809.2(a) & (b).) The physician may question the panel members and hearing officer on voir dire, and has "the right to challenge the impartiality of any member or hearing officer." (Bus. & Prof. Code, § 809.2, subd. (c).) The hearing

---

[1] The California Medical Association model medical staff bylaws in fact require the hearing officer to be a lawyer. St. Joseph's Medical Center of Stockton's medical staff bylaws do not contain this particular requirement, but the hearing officer in this case was nonetheless a lawyer.

[2] Additional protections may be required by individual hospitals. Although the hearing at issue here was run pursuant to the hospital's medical staff bylaws, the bylaws' hearing officer requirements are similar to, and not inconsistent with, those of the peer review statute. (See Bus. & Prof. Code, § 809.6, subd. (a).)

officer, if one has been selected, is responsible for ruling on such challenges.  (*Ibid.*)

## B.

St. Joseph's Medical Center of Stockton is a private, self-governing hospital owned by Dignity Health, a California-based health care organization.  In 2007, St. Joseph's hired Sundar Natarajan, M.D., as director of its hospitalist program.  About two years later, Natarajan left this position and started his own hospitalist group that also operated out of St. Joseph's. Beginning in 2011, the St. Joseph's medical staff raised concerns about Natarajan's hospitalist practice, including deficient recordkeeping, excessive length of patient stay, and misuse of consultants.   The medical staff repeatedly reprimanded and issued fines to Natarajan because of his recordkeeping deficiencies.  Although Natarajan acknowledged the problem, the recordkeeping issues persisted.  By August 2013, the chair of the medical department notified Natarajan that a committee of physicians would launch an investigation into these alleged administrative deficiencies.   After the investigation, the committee recommended revoking Natarajan's privileges.  The medical executive committee then reviewed the recommendation, considered Natarajan's responsive presentation, and adopted the recommendation to terminate his medical staff membership and hospital privileges.

Natarajan requested a peer review hearing to review the recommendation.  In accordance with St. Joseph's bylaws, the chief of the medical staff selected physicians to serve on the hearing panel, and the hospital president exercised authority delegated by the medical staff to select A. Robert Singer, a semiretired attorney, to serve as the hearing officer.

Invoking his statutory right to "challenge the impartiality of any member or hearing officer" under Business and Professions Code section 809.2, subdivision (c) (section 809.2(c)), Natarajan challenged Singer's appointment on grounds of financial bias. Natarajan's challenge relied primarily on this court's decision in *Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017 (*Haas*). In *Haas*, this court found a due process violation where a county appointed an attorney to serve as an ad hoc temporary hearing officer to adjudicate a business licensing dispute. *Haas* reasoned that the nature of the relationship between the county and the attorney created an impermissible temptation for the attorney to favor the county in hopes she might be hired to adjudicate more cases in the future. (*Id.* at p. 1020.) Natarajan argued that Singer had an analogous temptation to favor Dignity Health. Natarajan emphasized that St. Joseph's hired Singer at the recommendation of Dignity Health, which was paying Singer for his work on the matter; and Singer had previously served as a hearing officer in eight peer review hearings, one of which was still ongoing, at other Dignity Health hospitals (in addition to conducting hearings at hospitals affiliated with other networks). Natarajan acknowledged that Singer's contract contained a provision that would preclude St. Joseph's from hiring him for three years. Natarajan argued, however, that this bar was insufficient because it did not extend to the dozens of other Dignity Health facilities in the state.

Singer, exercising his section 809.2(c) authority to rule on disqualification motions, denied Natarajan's challenge. Later, after several evidentiary hearings spanning nearly a year, the peer review panel upheld the medical executive committee's recommendation to revoke Natarajan's staff membership and privileges.

Natarajan filed an administrative appeal. He did not challenge the sufficiency of the evidence supporting the panel's decision; his primary argument was instead that he had not received a fair hearing because of Singer's purported financial conflict. Rejecting the argument, the governing board's subcommittee affirmed the panel's decision. Natarajan then filed a petition for writ of administrative mandate in the superior court. The superior court denied the petition, concluding, as relevant here, that Natarajan had not established that Singer stood to gain a "direct financial benefit from the outcome" of the proceeding. (§ 809.2(b).)

Natarajan appealed. In a published decision, the Court of Appeal rejected Natarajan's challenge to Singer's ruling on his disqualification motion. The court reasoned that in the context of private hospital peer review, disqualification standards are not governed by constitutional due process, as in *Haas*, but by statute; section 809.2(b) specifies that the hearing officer "shall gain no direct financial benefit from the outcome." (Bus. & Prof. Code, §§ 809.2(b), 809.7; *Natarajan v. Dignity Health* (2019) 42 Cal.App.5th 383, 391 (*Natarajan*).) Concluding that potential reappointment within the same private hospital network does not qualify as a direct financial benefit, the Court of Appeal affirmed the denial of Natarajan's writ petition. (*Natarajan*, at p. 392.)

In so holding, the Court of Appeal disagreed with *Yaqub v. Salinas Valley Memorial Healthcare System* (2004) 122 Cal.App.4th 474 (*Yaqub*), which, relying on *Haas*, held that a hospital peer review hearing officer should have been disqualified because, among other things, the hearing officer had been appointed on an ad hoc basis and there was a possibility he would be reappointed in the future.

We granted review to address the disagreement between the published decisions of the Courts of Appeal.

## II.

The "peer review statute, like the common law fair procedure doctrine that preceded it, 'establishes minimum protections for physicians subject to adverse action in the peer review system.' " (*El-Attar*, *supra*, 56 Cal.4th at p. 988, quoting *Mileikowsky*, *supra*, 45 Cal.4th at p. 1268; see Bus. & Prof. Code, § 809.2.) One of these protections is the right to a hearing before an impartial body. To secure this right, the peer review statute permits physicians to question panel members and hearing officers and to challenge their impartiality. (§ 809.2(c).) Unlike the codes that govern the disqualification of judges (Code Civ. Proc., § 170.1) or neutral arbitrators (e.g., *id.*, §§ 1281–1281.95), the peer review statute does not contain comprehensive standards to determine whether panel members or officers should be disqualified. But it does contain an express standard for disqualification on the basis of financial interest in the proceeding: A hearing officer, like members of the peer review panel, "shall gain no direct financial benefit from the outcome." (Compare § 809.2(b) with § 809.2(a).)

The parties agree that section 809.2(b)'s "direct financial benefit" standard governs this case but disagree about how it applies. Natarajan contends that the prospect of future work for the same hospital or an affiliated hospital network is a direct financial benefit that requires disqualification. Dignity Health, for its part, maintains that an interest in possible future

8

employment is an insufficient ground for disqualifying a nonvoting hearing officer from service.

## A.

Before assessing the parties' competing positions, we begin by surveying the common ground between them. The term "direct financial benefit" is undefined in the peer review statute, but it is not an unfamiliar standard. As both sides agree, the term parallels — and by all appearances, derives from — the disqualification standard that courts had developed as a matter of common law fair procedure before the peer review statute was enacted. Drawing in turn on due process case law, courts explained that fair procedure includes the right to an impartial decision maker. (*Applebaum*, *supra*, 104 Cal.App.3d at p. 657, citing, inter alia, *Withrow v. Larkin* (1975) 421 U.S. 35, 47; *American Motors Sales Corp. v. New Motor Vehicle Bd.* (1977) 69 Cal.App.3d 983, 991 (*American Motors Sales Corp.*); accord, *Lasko v. Valley Presbyterian Hospital* (1986) 180 Cal.App.3d 519, 529.) They explained that disqualification of the decision maker "should occur if there is actual bias," but that "[d]isqualification may also be necessary if a situation exists under which human experience teaches that the probability of actual bias is too high to be constitutionally tolerable." (*Hackethal v. California Medical Assn.* (1982) 138 Cal.App.3d 435, 443 (*Hackethal*).) One example of a situation where "the probability of actual bias is too high" is when the adjudicator "has a *direct pecuniary interest* in the outcome." (*Ibid.*, italics added; accord, *Lasko*, at p. 529.)

The parties agree that when the Legislature used the nearly identical phrase "direct financial benefit from the outcome" in setting out a financial conflicts standard in section

809.2(b), it meant to codify the common law rule. This stands to reason, since, as we explained in *El-Attar*, the peer review statute was, in general, designed to codify common law fair procedure. (See *El-Attar*, *supra*, 56 Cal.4th at p. 988.) Considering section 809.2(b) from that vantage point makes certain points clear. First, as both sides agree, section 809.2(b) — like the parallel provision governing panel members in section 809.2(a), and like the common law rule that preceded them both — requires disqualification when financial conflicts create an unacceptable risk of bias.[3] (See *Hackethal*, *supra*, 138 Cal.App.3d at p. 443.) Most obviously, this means neither the panel members nor the hearing officer may stand to realize financial gain as a direct result of the outcome of the proceeding. For example, a hospital cannot pay the hearing officer more depending on whether the peer review proceeding resulted in the termination of staff privileges. (Cf. *Tumey v. Ohio* (1927) 273 U.S. 510, 535 [criminal defendant denied due process because adjudicator had a "direct pecuniary interest in the outcome" in the form of costs and fees awarded only if defendant was convicted]; see *id.* at pp. 531–532.) Further, to take an example that arises more commonly in the peer review setting, section 809.2(a) and (b) also mean that neither a panel member nor a hearing officer may serve if that person is a direct business competitor and thus stands to profit if the physician were ultimately to lose staff privileges. (*Hackethal*, at p. 443 [if shown to be a business competitor of the petitioner, tribunal

---

[3] This agreement makes it unnecessary for us to further address the issue Natarajan had originally posed in his petition for review, which asked whether section 809.2(b) requires disqualification only in the event of actual bias or whether it also reaches cases involving the appearance of bias.

member could be subject to disqualification for having "a direct pecuniary interest in the outcome"]; cf. *Gibson v. Berryhill* (1973) 411 U.S. 564, 579 [state board composed of optometrists disqualified from adjudicating revocation of licenses of competing optometrists on grounds of "substantial pecuniary interest[s]"]; see *id.* at p. 578.) Courts had so held as a matter of common law fair procedure (see *Hackethal*, at p. 443), and it is undisputed that the same prohibition applies by virtue of section 809.2's codification of the common law standard.[4]

There is, however, no similarly clear answer to the question whether section 809.2(b) reaches financial conflicts based on the hearing officer's possibility of future employment. No prestatutory fair procedure case ever addressed the question. The Court of Appeal, in its opinion, suggested the answer was clear from the Legislature's choice of the term " 'direct financial benefit,' " reasoning that if the Legislature had intended to disqualify a hearing officer who has a "mere *possible* interest in future employment," it would have described the disqualifying benefit as " 'potential' or 'possible,' rather than 'direct.' " (*Natarajan, supra,* 42 Cal.App.5th at pp. 391–392.) We are, however, unpersuaded that the plain language of the statute categorically exempts financial conflicts based on the possibility of future financial gain. In ordinary parlance, the word "direct"

_____

[4] The parties' agreement on this point appears to reflect a more general consensus about the disqualification of business competitors in peer review. The problem arises enough that it is explicitly mentioned in the federal peer review statute, which is otherwise silent on questions of peer review participant disqualification; the statute directs that neither panel members nor hearing officers may serve if they are "in direct economic competition with the physician involved." (42 U.S.C. § 11112(b)(3)(A)(ii)–(iii).)

connotes immediacy: the "absence of an intervening agency . . . or influence" or "stemming immediately from a source." (Webster's 9th New Collegiate Dict. (1988) p. 358.) But much like the word "immediate" itself, "direct" is a relative term. The competitor cases illustrate the point. An adjudicator does not gain an immediate financial benefit from disciplining a competitor in the sense that money automatically lands in the adjudicator's hands upon ruling, as would a bribe or a kickback. Still, no one disputes that business competitors can have a disqualifying direct financial interest in a disciplinary proceeding. The common law fair procedure cases explain why: Even though the prospect of gaining a competitive advantage is not *as* direct a benefit as money in hand, it is *sufficiently* direct to create a "distinct possibility" the controversy "will not be decided on its merits but on the potential pecuniary interest" of the adjudicator. (*American Motors Sales Corp.*, *supra*, 69 Cal.App.3d at p. 988; see *id.* at p. 987; see also *Gibson v. Berryhill*, *supra*, 411 U.S. at p. 579 [adjudicator's "financial stake need not be *as* direct or positive as it appeared to be in *Tumey* [*v. Ohio*, *supra*, 273 U.S. 510]" for it to be disqualifying (italics added)].)

Reading section 809.2(b) against this backdrop, we agree with both sides that the question before us is not simply whether the hearing officer will receive a guaranteed payout depending on the results of the peer review hearing. It is, rather, whether the hearing officer stands to gain a financial benefit that creates

an unacceptable risk that the officer will make his decisions with his mind on money, not on the merits.

## B.

We now move from common ground to contested terrain. Our jumping-off point is *Haas, supra,* 27 Cal.4th 1017. As noted above, *Haas* was a due process challenge to a county business licensing appeal based on the financial conflicts associated with the way the county had appointed the administrative hearing officer. The administrative hearing officer was not a county official but was a practicing lawyer who had been hired by the county on an ad hoc basis to adjudicate the proceedings. She had not been hired by the county previously, but the county's counsel indicated that the county intended to use the officer again " 'as the occasion suggests, in the future if she's interested in doing it and if the case should arise' " and that the county's contract with the officer was " 'open-ended.' " (*Id.* at p. 1022.) This court held that, as a matter of due process, the officer should have been disqualified.

We explained that due process requires quasi-judicial decision makers, like judicial officers, to be fair and impartial. And while adjudicators are ordinarily afforded a presumption of impartiality, no such presumption applies where financial interests are concerned; rather, due process requires the disqualification of an adjudicator who has a financial interest that "would offer a possible temptation to the average person as judge not to hold the balance nice, clear and true." (*Haas, supra,* 27 Cal.4th at p. 1026.) It was this basic principle, we explained, that led courts to condemn so-called fee systems, in which prosecutors and plaintiffs chose a judge who was paid a flat fee for each case adjudicated. Although the judge was paid

regardless of outcome, more cases meant more compensation, and so the selection process gave the judge "a pecuniary incentive to favor frequent litigants." (*Id.* at p. 1028, citing, inter alia, *Brown v. Vance* (5th Cir. 1981) 637 F.2d 272, 274.) From the fee system cases we derived this general lesson: "A procedure holding out to the adjudicator, even implicitly, the possibility of future employment in exchange for favorable decisions creates such a temptation and, thus, an objective, constitutionally impermissible appearance and risk of bias." (*Haas*, at p. 1034.)

Natarajan contends that *Haas* applies here and requires the disqualification of hearing officers who are appointed on an ad hoc basis, because the possibility of future hearing officer employment creates an unacceptable risk of bias. Dignity Health disagrees. It contends *Haas* is distinguishable, and that the practical consequences of importing its due process standard to the peer review context would be to require the disqualification of virtually all experienced hearing officers, the vast majority of whom are lawyers appointed by hospitals on an ad hoc basis.

As an initial matter, we agree with Dignity Health that *Haas* does not directly control this case. The question before us concerns the meaning of the peer review statute's disqualification standard for hearing officers in section 809.2(b); *Haas* was not a peer review case and did not interpret or address section 809.2(b). And *Haas* was not decided until 13 years after the peer review statute was enacted, so the Legislature could not possibly have written section 809.2(b) with *Haas* in mind.

Nonetheless, we consider *Haas* helpful to our analysis inasmuch as it explains why a decision maker's interest in

future employment can sometimes affect the decision maker's impartiality, though it may not operate as directly as an outright bribe or kickback. As *Haas* explains, when an adjudicator's prospect for similar work in the future is entirely dependent on the goodwill of the hiring entity that is free to select its adjudicators, adjudicators may face financial temptations not to hold the balance " 'nice, clear and true.' " (*Haas*, *supra*, 27 Cal.4th at p. 1029.) For hospital peer review hearing officers, the financial benefits at stake may be sufficiently "direct" to require disqualification under section 809.2(b).

But while we conclude that the possibility of future employment *may* give rise to a disqualifying conflict, we do not hold that the possibility of future employment *always* (or nearly always) gives rise to a disqualifying conflict when a hearing officer has been appointed on an ad hoc basis. Potential future employment, on its own, is not automatically disqualifying. If it were, then every hospital would presumably be required to locate and train a new hearing officer for every peer review hearing it holds. This rule would come at considerable cost to the efficiency and the integrity of the peer review process, and with minimal benefit in terms of assurance of hearing officer impartiality. The law imposes no such requirement.

Nor do we hold that disqualification is required whenever a hospital expresses interest in employing a hearing officer again in the future if the circumstances arise, regardless of the extent of the hearing officer's financial interest in future employment with that particular hospital. When we found a disqualifying bias in *Haas*, we explained that the county's ad hoc appointment of the hearing officer deviated from the recognized norm in quasi-judicial governmental adjudications, which is to

use hearing officers who are full- or part-time employees of the local or state government. Where the county had expressed interest in employing that particular individual on future occasions, the ad hoc hiring process created a risk that she would be rewarded with future remunerative employment should she render decisions favorable to the county. We considered that risk unacceptable under the circumstances. (See *Haas*, *supra*, 27 Cal.4th at p. 1037, citing Gov. Code, §§ 27720, 27727.)

Significant differences between the relevant settings counsel against a presumption that the circumstances that created an intolerable risk of bias for the ad hoc administrative judge in *Haas* would necessarily also create an intolerable risk for a hearing officer conducting hospital peer review. While the recognized norm is to use employee adjudicators in the county quasi-judicial administrative proceedings context, the same norm does not hold in the peer review context. California's hundreds of health care facilities generally select hearing officers to serve only as the need arises, and hearing officers, like Singer in this case, frequently find themselves performing similar work for various entities. And by design, it is ultimately the peer reviewers — not the hearing officers — who possess the specialized knowledge required to evaluate the medical qualifications of other practitioners and who are granted decisionmaking authority as the "trier[s] of fact." (*Mileikowsky*, *supra*, 45 Cal.4th at p. 1269; § 809.2(b); § 809.2(a).) A hearing officer — if one is selected at all — plays a comparatively limited role in peer review proceedings.

We do not suggest, of course, that the comparatively limited role of hearing officers makes their impartiality irrelevant. Peer review hearing officers are not entirely walled

off from the decisional process and can make procedural and evidentiary rulings that can affect what evidence the triers of fact can use as a basis for making their decision.[5] It is presumably for these reasons that the statute secures the right to an impartial hearing officer, as well as impartial panel members. (§ 809.2(c).) But *Haas* did not consider the different circumstances that might be present in the context of peer review proceedings, where, among other things, hearing officers preside over and make significant rulings that affect the proceedings but ultimately have no vote on the ultimate issue, which is reserved for the judgment of an expert panel of the physician's peers.

Natarajan suggests that the difference in contexts in some ways might require more demanding disqualification standards than ordinary judicial or quasi-judicial adjudication, as substantive errors by biased individuals might go unremedied because of the deferential standard of review applicable to peer review proceedings. (Code Civ. Proc., § 1094.5, subd. (b) [abuse of discretion].) Whatever merit this argument may have in other contexts, it has limited force here. Whether a hearing

---

[5] As the Court of Appeal noted, the statute permits a hearing officer to "participate[] in the committee's deliberations as a legal advisor, without a vote in the committee's decision." (*Natarajan, supra*, 42 Cal.App.5th at p. 387; see *id.* at p. 386.) Here, Singer served as advisor to the panel, but did not vote on the outcome; he also evidently assisted the panel in drafting its written report. Contrary to Natarajan's arguments, however, the record contains no indication that Singer substantively influenced the panel's decisions or otherwise overstepped the bounds of the role assigned to him by statute or by hospital bylaws.

officer's procedural rulings give rise to prejudicial error is a question of law reviewed independently on the administrative record (*Pomona Valley Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93, 101), and a finding of prejudicial error would entitle the licentiate to a new hearing. Judicial review cannot, of course, stand in for a fair proceeding in the first instance. (*Haas*, *supra*, 27 Cal.4th at p. 1034.) But the scope of judicial review in peer review proceedings does not persuade us that we must apply a heightened standard for the disqualification of hearing officers on the basis of financial conflicts.

Ultimately the question concerns when the risk of financial bias becomes intolerable under the circumstances. This is an inherently context-sensitive inquiry, and it should be undertaken with appropriate regard for the unique features of the hospital peer review context.

## C.

Our conclusions about the governing law mean we must part company with the Court of Appeal in this case, which considered the prospect of future employment to be categorically beyond the reach of section 809.2(b). But we also part ways with *Yaqub*, *supra*, 122 Cal.App.4th 474, whose analysis diverges from ours in several respects. The court in that case considered, solely as a matter of general principles of fair procedure, whether a peer review hearing officer should be disqualified for bias for several reasons: that he had presided over the same physician's prior hearing; that he had once served on the board of governors for the hospital's foundation, which raised funds for the hospital; and that he had been hired on an ad hoc basis to preside over a number of peer review hearings for the same

hospital in the past and "there was the potential for further appointments in the future." (*Id.* at p. 485; see *id.* at p. 481.) The Court of Appeal in *Yaqub* concluded that, although there was "no evidence of actual prejudice or of a direct financial interest in the outcome of the case," the circumstances surrounding the ad hoc hiring of the hearing officer were sufficient to create a " 'possible temptation' " to favor the hospital that led to a disqualifying "appearance of bias" under *Haas*. (*Id.* at pp. 485, 484.)

As the Court of Appeal in this case explained, *Yaqub* never considered the import of section 809.2(b), the provision that governs in this case. But this was not *Yaqub*'s most significant error.[6] As we have explained above, the parties agree that section 809.2(b) was designed to embody principles of fair procedure, which is what *Yaqub* purported to apply in that case. The more significant difficulty comes from *Yaqub*'s suggestion that disqualification was required because of an "appearance of bias," even in the absence of evidence "of a direct financial interest in the outcome of the case." (*Yaqub*, *supra*, 122 Cal.App.4th at pp. 484, 485; see *id.* at p. 481.) Contrary to

---

[6]    If indeed it was error at all; the opinion does not mention whether the hospital at issue was private or public, and thus whether Business and Professions Code section 809.2 applied.

The Court of Appeal in this case also declined to follow *Yaqub* because it failed to appreciate that *Haas* was based on due process principles applicable to public entities, whereas due process principles do not apply to private hospitals. (*Natarajan*, *supra*, 42 Cal.App.5th at pp. 389–390, 392.) We express no view on whether, or to what extent, due process may impose different requirements from common law fair procedure in various contexts; for purposes of our analysis here, it makes no difference.

*Yaqub*, we conclude that disqualification is required only when there exists a direct pecuniary interest — in the words of section 809.2(b), a "direct financial benefit" — that creates an intolerable risk of actual bias. Such a risk does not arise in every case simply because a hearing officer has been hired by a hospital on an ad hoc basis and may be hired again by the same hospital at some indefinite point in the future. To the extent *Yaqub v. Salinas Valley Memorial Healthcare System*, *supra*, 122 Cal.App.4th 474 can be understood as holding otherwise, we disapprove it.

## D.

We now consider whether, on the facts of this case, Natarajan showed that the prospect of future employment created an intolerable risk of bias that should have disqualified Singer from serving as a hearing officer. Two central factors guide our inquiry in this case: whether a particular entity exercises control over the hearing officer selection process, and the extent and likelihood of future financial opportunities that the hearing officer may receive from the same entity.[7]

Here, Singer was formally appointed by St. Joseph's. Since retiring from his law firm, Singer received most of his income from hearing officer work at various health facilities,

---

[7] As part of the disqualification inquiry, a reviewing court may need to consider whether the hearing officer has offered the physician an adequate opportunity to establish a record on the factors relevant to disqualification and, if necessary, permit additional discovery to augment the record, as the trial court did here.

often earning substantial sums from these appointments.[8] We can therefore assume that Singer had more than a trivial incentive to do what he could to put himself in a good position for future hearing officer appointments at St. Joseph's. But Singer's contract prohibited further appointments at St. Joseph's for a period of three years, meaning that Singer's only immediate employment prospects lay with facilities not involved in the particular proceeding at issue. Whatever financial interest Singer may have had in the outcome of the proceedings at St. Joseph's, it was not sufficient to raise a meaningful risk of bias.

The three-year bar offers an additional reason why this case differs from *Haas*, beyond the differences associated with the hospital peer review setting (see pp. 14–18, *ante*). In *Haas*, the county's counsel had affirmatively expressed interest in hiring the hearing officer again " 'in the future if she's interested in doing it and if the case should arise' "; the county's contract with the hearing officer was " 'open-ended' "; and the county and the hearing officer both anticipated the possibility of her being hired for future hearings. (*Haas*, *supra*, 27 Cal.4th at p. 1022.) *Haas* suggested a temporary bar on future employment was one way to "eliminate the risk of bias." (*Id.* at p. 1037, fn. 22.) We do not hold that such a temporary bar is invariably required for hospital peer review hearing officers; again, the inquiry will

---

[8] In addition to his eight hearing officer appointments at different facilities in the Dignity Health network before the St. Joseph's hearings began in 2014, Singer reported that he had also served as a hearing officer at a similar number of hearings for entities affiliated with Sutter Health, as well as at a few hearings at facilities under other hospital network umbrellas, including Kaiser and Banner Health.

depend on the circumstances. But we agree with the superior court in this particular case that the three-year bar on serving as a hearing officer at St. Joseph's was sufficient to eliminate any significant financial temptation Singer might otherwise have had to favor St. Joseph's or its medical staff.

Natarajan argues the bar was insufficient because it did not extend to other hospitals across the Dignity Health network. This argument depends on the factual premise that Dignity Health, rather than the hospital medical staff, controlled the selection process of hearing officers at least at St. Joseph's, if not also at other affiliate hospitals. If Dignity Health did not have control over the process at St. Joseph's, let alone at its other affiliate hospitals, Singer would have no reason to believe that the outcome of this proceeding would affect his prospect of future employment at another Dignity Health facility.

To evaluate this argument requires us to take a closer look at what the relevant statutes and record show about Dignity Health's role in Singer's selection to conduct the hearing at St. Joseph's. By law, the choice was not Dignity Health's to make. The peer review statute authorizes an individual hospital's medical staff to grant or revoke hospital privileges, and to decide how peer review should be structured within the bounds prescribed by statute, including whether and how the peer review panel and hearing officer are selected. (Bus. & Prof. Code, §§ 809, subd. (a)(8), 2282.5 [medical staff self-governance].) The medical staff is a separate legal entity from the hospital itself. (*Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1130, fn. 2.) This structure carries with it certain baseline assurances. Since a hospital's medical staff is made up of doctors and other licentiates who could one day themselves be subject to a peer review hearing,

each medical staff has an incentive to ensure fairness in the process for conducting peer review, including how hearing officers are selected.

Here, St. Joseph's medical staff, through its bylaws, delegated the authority to appoint hearing officers to the St. Joseph's president. This delegation, in itself, is of no moment; we have already held that a hospital's unilateral selection, even when made via delegation to a hospital official, ordinarily comports with the peer review statute and basic principles of fair procedure. (*El-Attar*, *supra*, 56 Cal.4th at pp. 989–991, 993.) After all, the statute provides that "a review hearing shall be held 'as determined by the peer review body' " — which can include " 'any designee of the peer review body' " (*id.* at p. 989; Bus. & Prof. Code, §§ 809, subd. (b), 809.2(a)) — and we do not presume that any hearing officer appointed by a medical staff's designee is likely to be biased. (*El-Attar*, at p. 995.) But Natarajan argues that the practical effect of the delegation in this case was to permit the hearing officer selection to be made at the direction of Dignity Health officials — rather than by officials at St. Joseph's — which raises concerns about Singer's incentives to please Dignity Health.

When Natarajan raised a similar argument in the trial court, that court found no evidence that Dignity Health was responsible for Singer's appointment. Natarajan contests some of the trial court's underlying findings, but our review of the record accords with the trial court's conclusion on this overarching point. Although a Dignity Health attorney initially contacted Singer to inquire about his availability to serve as a peer review hearing officer at St. Joseph's, the decision ultimately resided with St. Joseph's officials: The St. Joseph's

medical staff delegated the authority to choose a hearing officer to the president of St. Joseph's, and it was the president who contacted and formally appointed Singer a few weeks later. Nothing in the record shows that the Dignity Health attorney directed or pressured the St. Joseph's president to select Singer.

In the absence of evidence to show that Dignity Health actually controlled the decision to hire Singer, Natarajan argues that, by virtue of corporate structure, Dignity Health effectively controls the president of St. Joseph's and any decision he makes. Under Dignity Health's bylaws, the hospital president is appointed by the hospital's community board (the governing body of the hospital), which is, in turn, established by Dignity Health. But the record contains no information about how the members of the community board are appointed (or removed) or how that board appoints (or removes) the hospital president. And standing alone, the manner in which the president is appointed is insufficient to establish that the hearing officer appointment here was made by Dignity Health, rather than by the president, acting independently on behalf of the medical staff.

In short, based on the record Natarajan assembled, we cannot conclude that Dignity Health controlled the appointment of Singer as a hearing officer at St. Joseph's; nor can we draw the further conclusion that Dignity Health controls hearing officer appointments at its other affiliate hospitals. And if Dignity Health did not control Singer's selection, there is no reason to believe that Singer had a possible temptation to skew the results in favor of St. Joseph's in the hopes of obtaining future work from another of Dignity Health's entities. We therefore reject Natarajan's argument that we should discount the effect of the three-year bar in this case because it applied

only to St. Joseph's and not to every other health facility affiliated with Dignity Health.

It is true, of course, that Singer and hearing officers may, in general, face some incentive to court future work at other hospitals by developing a prohospital reputation. An employer-specific temporary bar will not completely eliminate that sort of incentive. But to eliminate such incentives entirely would require ad hoc hearing officers to forswear future employment at any hospital. The ban on receiving a "direct financial benefit from the outcome" (§ 809.2(b)) does not reach so far. The point of this type of precaution is not to bar a hearing officer from any future work, nor is it to eliminate ad hoc engagements altogether. It is, rather, to secure the basic preconditions for a fair hearing on a physician's qualifications.

As this case demonstrates, hospitals and their medical staffs can choose from a variety of tools to ensure the basic statutory preconditions are satisfied, including the use of temporary bars on reappointment. They are also free to take other measures not inconsistent with the statute, as appropriate given the circumstances of each particular case. (See *Mileikowsky*, *supra*, 45 Cal.4th at p. 1274 [medical staff bylaws can provide additional peer review protections beyond statutory requirements].)[9] Once again, what measures are necessary will

---

[9] For instance, Natarajan takes issue with the fact that the statute permits hospitals to choose hearing officers unilaterally; arbitrators, by contrast, are to be "selected by a process mutually acceptable to the licentiate and the peer review body." (§ 809.2(a).) The argument suggests that giving physicians a role in recommending or selecting hearing officers could help to attenuate any connection between an outcome in one hearing

depend on a careful, context-specific judgment about the risk of bias presented on the facts. Here, based on the record before us in this particular case, we conclude the circumstances surrounding Singer's appointment did not create an intolerable risk of bias that would require disqualification under section 809.2(b).

## III.

We affirm the judgment of the Court of Appeal.

**KRUGER, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**
**JENKINS, J.**

---

and a hospital's hiring decision in the next. To Natarajan's point, nothing in the statute requires medical staffs to permit the physician to play a role in the selection process, but neither does the statute forbid medical staffs from allowing the physician some role if they so choose.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Natarajan v. Dignity Health

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 42 Cal.App.5th 383
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S259364
**Date Filed:** August 12, 2021

_____

**Court:** Superior
**County:** San Joaquin
**Judge:** Barbara A. Kronlund

_____

**Counsel:**

Law Offices of Stephen D. Schear, Stephen D. Schear; Justice First, Jenny Chi-Chin Huang; and Tara Natarajan for Plaintiff and Appellant.

Manatt, Phelps & Phillips, Barry S. Landsberg, Doreen Wener Shenfeld, Joanna S. McCallum and Craig S. Rutenberg for Defendant and Respondent.

Davis Wright Tremaine and Terri D. Keville for John Muir Health, Adventist Health, Kaiser Foundation Hospitals, MemorialCare Health System, Providence St. Joseph Health, Sharp Healthcare and Sutter Health as Amici Curiae on behalf of Defendant and Respondent.

Arent Fox, Lowell C. Brown, Sarah Benator and Diane Roldán for California Hospital Association as Amicus Curiae on behalf of Defendant and Respondent.

Nossaman, Rosenberg, Shpall & Zeigen, Carlo Coppo; Patrick K. Moore Law Corporation, Patrick K. Moore; Hanson Bridgett, Glenda M. Zarbock; James R. Lahana; and John D. Harwell as Amici Curiae on behalf of Defendant and Respondent.

Horvitz & Levy, H. Thomas Watson, Peder K. Batalden and Joshua C. McDaniel for Scripps Health and Regents of the University of California as Amici Curiae on behalf of Defendant and Respondent.

Francisco J. Silva, Long X. Do and Joseph M. Cachuela for California Medical Association as Amicus Curiae.

Freeman Mathis & Gary, Marc J. Shrake; and Joseph P. Wood for American Academy of Emergency Medicine as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Stephen D. Schear
Law Offices of Stephen D. Schear
2831 Telegraph Avenue
Oakland, CA 94609
(510) 708-9636

Barry S. Landsberg
Manatt, Phelps & Phillips, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
(310) 312-4259