Filed 1/18/24  Barnes v. Governing Bd. of John F. Kennedy Memorial Hospital CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| H. CHRISTOPHER BARNES, Plaintiff and Respondent, v. GOVERNING BOARD OF JOHN F. KENNEDY MEMORIAL HOSPITAL, INC., Defendant and Appellant; MEDICAL EXECUTIVE COMMITTEE OF JOHN F. KENNEDY MEMORIAL HOSPITAL, INC., Real Party in Interest and Appellant. | D081548 (Super. Ct. No. CVPS2201690) |

APPEAL from an order of the Superior Court of Riverside County, Manuel Bustamante, Judge.  Affirmed.

Davis Wright Tremaine, Thomas R. Burke, Terri D. Keville, Anna R. Buono and Miriam R. Swedlow for Defendant and Appellant Governing Board of John F. Kennedy Memorial Hospital, Inc. and Real Party in Interest and Appellant Medical Executive Committee of John F. Kennedy Memorial Hospital, Inc.

Donald Aquinas Lancaster, Jr. for Plaintiff and Respondent.

The Governing Board of John F. Kennedy Memorial Hospital, Inc. (the Governing Board) and the Medical Executive Committee of John F. Kennedy Memorial Hospital, Inc. (the Medical Executive Committee) appeal from an order denying their special motion to strike brought under the anti-SLAPP statute (Code Civ. Proc.,[1] § 425.16). The special motion to strike targeted portions of the combined writ petition and complaint for declaratory relief brought by H. Christopher Barnes, M.D., in which Barnes challenges the termination of his medical staff membership at John F. Kennedy Memorial Hospital (JFK). We conclude that the trial court properly determined that the special motion to strike lacked merit, and we accordingly affirm the trial court's order denying the motion.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Hospital Peer Review Proceeding Involving Barnes*

Barnes is a surgeon who was an active member of the JFK medical staff beginning in 2004.[2] In 2014, JFK's Medical Staff Office began to receive reports that Barnes was engaging in unprofessional and disruptive behavior.

---

[1]    Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure. " 'SLAPP' is an acronym for 'strategic lawsuit against public participation.' " (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 381, fn. 1 (*Baral*).) The anti-SLAPP statute sets forth the standards and the procedure for striking "meritless claims arising from protected activity." (*Id.* at p. 384, italics omitted.)

[2]    In setting out the basic background facts, we rely, in part, on the Procedural History section of the decision of the Appeal Board of the Governing Board, as that decision provides a useful summary of the basic facts, and the parties have not disputed its factual accuracy.

After unsuccessful informal attempts to address the matter with Barnes, the Medical Executive Committee retained an external organization, EXTTI Incorporated (EXTTI) to conduct an investigation into the credibility of the reports and to assess Barnes's assertions that the reports were discriminatory and retaliatory. EXTTI issued a report in December 2016, which described "strong personality conflicts that could impact patient care."

In response, the Medical Executive Committee voted to conduct a formal corrective action investigation. In February 2017, the corrective action investigation committee made a preliminary recommendation that Barnes enter into a progressive discipline agreement and enroll in two anger management courses. Barnes indicated that he would not enter into the agreement or enroll in the courses. The Medical Executive Committee then decided that it would terminate Barnes's JFK medical staff membership if he did not comply with its requests. Barnes refused to take the required actions, and the Medical Executive Committee notified Barnes on April 14, 2017, that his medical staff membership would be terminated, but that he had the right to request a hearing with the Judicial Review Committee (JRC). Barnes requested a JRC hearing.

The Medical Executive Committee provided Barnes with a Notice of Charges on May 23, 2017, and a First Amended Notice of Charges on October 9, 2017. Those documents alleged that Barnes engaged in "an on-going pattern of inappropriate, unacceptable interpersonal relations with hospital personnel, medical staff members, patients and their families," and "abusive disruptive behavior." The operative First Amended Notice of Charges set forth 30 specific charges involving a range of conduct from 2014 to 2017.

The Medical Executive Committee appointed a JRC hearing officer, and the parties then approved five physicians to serve as members of the JRC. One of the five members served as an alternate, and one was subsequently recused by the hearing officer.

The JRC heard evidence during 19 hearing sessions from April 2018 to April 2021. The parties submitted closing briefs, and the JRC then issued findings and conclusions in July 2021. The JRC decided that the Medical Executive Committee's recommendation to terminate Barnes's medical staff membership was reasonable and warranted.

Barnes requested appellate review of the JRC decision before an Appeal Board appointed by the Governing Board. Barnes raised a range of issues with the Appeal Board, most of which were focused on the alleged failure of the Medical Executive Committee and the JRC to follow JFK's Medical Staff Bylaws (JFK Bylaws) and the applicable California laws in conducting the peer review proceeding. Because many of the issues that Barnes raised with the Appeal Board are the same issues that Barnes raises in this litigation, we detail those issues here.

First, Barnes contended in his arguments to the Appeal Board that one of the physicians that served as a JRC member, Dr. S.C.,[3] should not have been on the JRC for several reasons. Barnes contended that Dr. S.C. was dishonest when asked during voir dire whether he (i.e., Dr. S.C.) was the subject of "any retention agreements." Specifically, Barnes pointed out that Dr. S.C. did not disclose that he was allegedly subject to a practice monitoring agreement. Barnes also contended that Dr. S.C. did not qualify under the JFK Bylaws to serve on the JRC.

---

[3]     We refer to the JRC member by the use of initials to preserve confidentiality.

4

Second, Barnes argued that the JRC hearing officer should not have appointed one of the JRC members as an alternate rather than an active member because there was no provision for such a procedure in the JFK Bylaws. Similarly, Barnes maintained that the JRC hearing officer did not have authority to recuse one of the JRC members.

Third, Barnes contended that the hearing officer improperly limited or excluded certain evidence. The purportedly wrongfully excluded evidence included the fact that, during the pendency of the proceeding before the JRC, Dr. Barnes's medical staff membership at JFK was automatically terminated by the Medical Executive Committee for a reason independent of the charges that were pending before the JRC. Specifically, Barnes's medical staff membership was automatically terminated in September 2018 by the Medical Executive Committee pursuant to JFK Bylaws section 7.3-5 because Barnes had failed to maintain professional liability insurance. With respect to the automatic termination, Barnes argued to the Appeal Board both that (1) the JRC should have considered evidence that his medical staff membership had *already* been terminated, which would have made it improper for his medical staff membership to be terminated based on the *additional* grounds alleged in the First Amended Notice of Charges; and (2) the automatic termination improperly occurred "without notice and a hearing."

Fourth, Barnes argued it was improper for the Medical Executive Committee to rely on EXTTI to conduct its investigation because EXTTI was composed of nonphysicians.

5

Fifth, Barnes contended that in presenting its case to the JRC, the Medical Executive Committee "over-relied on hearsay evidence," so that the charges against him were not supported by substantial evidence.[4]

Sixth, Barnes challenged the termination decision based on the fact that in 2015 and 2017 he received positive practice evaluations and was reappointed to the medical staff.[5]

Finally, Barnes objected to some of the language of the "805 report" that the Medical Executive Committee would be required by law to submit to the Medical Board of California and the National Practitioner Data Bank in the event that the termination of Barnes's medical staff membership was sustained.[6] The JRC decision set forth proposed language for the 805 report, but Barnes believed that some of it was inaccurate.

---

[4]    The JFK Bylaws provide that at a hearing before the JRC, "[a]ny relevant evidence, including hearsay, shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the admissibility of such evidence in a court of law."

[5]    Pursuant to applicable regulations (Cal. Code Regs., tit. 22, § 70701, subd. (a)(7)) and the JFK Bylaws, physicians must seek reappointment to the hospital medical staff at least once every two years.

[6]    The report to the Medical Board of California and the National Practitioner Data Bank was required as a result of Business and Professions Code section 805, subdivision (b)(2), which requires the filing of a report with the Medical Board of California within 15 days after a peer review body terminates or revokes "[a] licentiate's membership, staff privileges, or employment . . . for a medical disciplinary cause or reason." (Bus. & Prof. Code, § 805, subd. (b)(2).) The statute refers to such a report as an "805 report" (*id.*, § 805), and we use that terminology here as well. In addition, "a hospital usually is required to report disciplinary actions to the National Practitioner Data Bank, established for the purpose of tracking the activities of incompetent physicians. (42 U.S.C. § 11133(a).) A hospital's decision to

The Appeal Board issued its decision in January 2022. The 42-page decision extensively discussed each of the issues raised by Barnes, found them to be without merit, and recommended that the Governing Board affirm the JRC's decision that the Medical Executive Committee's termination of Barnes's medical staff membership was reasonable and warranted. The Appeal Board also recommended that the language of the 805 report be revised in certain respects. At a January 20, 2022 meeting, the Governing Board adopted the Appeal Board's decision.

B.     *Barnes Files This Litigation to Challenge the Governing Board's Decision*

On April 28, 2022, Barnes initiated this action by filing a combined petition for a writ of mandate (§ 1085), petition for a writ of administrative mandamus (§ 1094.5), and complaint for declaratory relief (the Petition). The Petition names the Governing Board as the only respondent/defendant, and it names the Medical Executive Committee *solely* as a real party in interest. Specifically, Barnes alleges that the Medical Executive Committee is named as a real party in interest because it would be "affected" by the lawsuit "insofar as [it] grants privilege[s] to physician[s] practicing medicine at JFK Memorial Hospital," and if Barnes prevailed in his lawsuit, the Medical Executive Committee "would be obligated to restore [his] privileges" and to "retract" the 805 report.

The Petition relies exclusively on the same allegations that Barnes presented to the Appeal Board regarding the failure of the Medical Executive Committee and the JRC to follow the JFK Bylaws and applicable California law in conducting the peer review proceeding. The allegations mirroring the

---

deny staff privileges therefore may have the effect of ending the physician's career." (*Mileikowsky v. West Hills Hospital & Medical Center* (2009) 45 Cal.4th 1259, 1268, fn. omitted (*Mileikowsky*).)

7

claims presented to the Appeal Board are spread out over the Petition's "causes of action" (capitalization omitted) for a writ of traditional mandate, writ of administrative mandamus and declaratory relief. Many of the allegations are repeated in more than one of the Petition's causes of action.

Specifically, over the course of the Petition, Barnes alleges that the following circumstances provide a ground for relief from the Governing Board's decision: (1) the participation of Dr. S.C. on the JRC because Dr. S.C. did not answer honestly when asked if he was subject to "any retention agreements," in that he did not disclose he was subject to a practice monitoring agreement and was on probation with the Medical Board of California, which allegedly suggests that Dr. S.C. was biased in favor of the Medical Executive Committee and was ineligible to serve on the JRC; (2) the failure of the Medical Executive Committee to provide Barnes with a hearing prior to the automatic termination of his medical staff privileges for failure to maintain malpractice insurance; (3) the exclusion from the JRC proceeding of certain evidence, including evidence related to the automatic termination of Barnes's medical staff privileges; (4) the continuation of the peer review proceeding before the JRC even though Barnes's medical staff membership had already been automatically terminated; (5) the over-reliance on hearsay evidence by the Medical Executive Committee during the JRC proceeding; (6) the improper reliance by the Medical Executive Committee on EXTTI to conduct an investigation even though EXTTI was not comprised of physicians; (7) the fact that in 2015 and 2017, Barnes received positive practice evaluations and was reappointed to the medical staff, which suggests that the charges brought by the Medical Executive Committee were "manufactured" as a "pretext"; and (8) the JRC hearing officer's improper decisions about the composition of the JRC.

In the Petition's prayer for relief, the only specific remedy that Barnes identifies is the issuance of a writ of mandate requiring the Governing Board and the Medical Executive Committee "to withdraw its [805] report to the Medical Board of the California [*sic*] and the National Practitioner Data Bank."[7] To the extent the cause of action for declaratory relief seeks a remedy different from the remedy sought in the prayer for relief, that cause of action specifically seeks "a judicial determination . . . with regard to whether [the Governing Board] and [the Medical Executive Committee] ensured that [Barnes] received a fair procedure in peer review proceedings and corrective actions proceedings" and whether the Medical Executive Committee "was required, and failed, to afford Dr. Barnes notice and a right to be heard pursuant to Business and Professions Code section 809.1 once his privileges were [automatically] terminated on October 18, 2018." The introductory section of the Petition more generally states that Barnes is seeking to have the court "reverse the decisions of the Governing Board and the JRC."

The Governing Board and the Medical Executive Committee first responded to the Petition by filing a demurrer. The demurrer argued that (1) the Medical Executive Committee was not a proper party to the litigation; and (2) the only viable way to challenge the decision of the Governing Board was to seek a writ of administrative mandamus (§ 1094.5), not a traditional writ of mandate (§ 1085) or declaratory relief. The trial court sustained the

---

7　We infer that because Barnes's medical staff membership was automatically terminated for the independent reason of his failure to maintain his malpractice insurance, he does not seek the remedy of an order reinstating his medical staff membership. Instead, the relief he seeks focuses on the remaining adverse consequence from the Governing Board's decision, namely, the required filing of the 805 report.

9

demurrer in part. It agreed that the Medical Executive Committee was improperly named in this action, but it determined that although most of the issues Barnes raised were cognizable only in a petition for a writ of administrative mandamus, one of the issues he raised could be addressed through a petition for a traditional writ of mandate.[8]

While the demurrer was pending, the Governing Board and the Medical Executive Committee filed a special motion to strike under the anti-SLAPP statute. The special motion to strike argued that, with the exception of what it described as Barnes's "narrow challenge to the Governing Board's final decision" contained in the cause of action seeking a writ of administrative mandamus, the remainder of the Petition's allegations fell within the scope of the anti-SLAPP because "they all arise from communications made in the course of peer review, or statements made to government agencies as mandated by law." The special motion to strike acknowledged that our Supreme Court has established that claims for relief based on the discipline imposed as a result of a peer review proceeding are not protected by the anti-SLAPP statute. (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1004 (*Bonni*).) However, according to the special motion to strike, many of the Petition's claims for relief were not based on the Governing Board's final decision to terminate Barnes's medical staff membership, but instead they "challenge[d] speech and conduct in the course of the [Medical Executive Committee's] investigation and the recommendations that led up to the Governing Board's final decision, as well as rulings made by the [JRC] Hearing Officer."

---

[8] Specifically, the trial court held that a proceeding in traditional mandate was proper for Barnes's claim that he was denied a hearing prior to the automatic termination of his medical staff membership.

10

The trial court denied the special motion to strike. It ruled that the Petition's allegations did not fall under the scope of the anti-SLAPP statute because "[t]he injurious conduct" targeted by the Petition "is the termination itself." (Underscoring omitted.) As the trial court explained, "While [Barnes] alludes to improper conduct by the [Medical Executive Committee] and hearing officer in violation of the [JFK] [B]ylaws, [Barnes] does not seek damages for statements or writings made during the course of the hospital peer review process. A request for judicial relief from an administrative decision is distinguishable from requests for damages that are based on alleged injury arising from hospital peer review activity."[9]

The Governing Board and the Medical Executive Committee appeal from the order denying their special motion to strike.[10]

---

[9] Somewhat inconsistently and confusingly, the trial court then went on to discuss several specific items in the Petition that would fall within the scope of the anti-SLAPP statute because they involved a statement or writing in connection with an official proceeding. The allegations that the trial court identified as meeting that description were Barnes's claims concerning the EXTTI report and the overreliance on hearsay during the JRC hearing, as well as Barnes's request for an order requiring the retraction of the 805 report. The trial court seems to have conducted a cursory second-prong inquiry and concluded that there may be merit to the first two items to the extent they were part of Barnes's allegation of procedural deficiencies in the peer review proceeding. Nevertheless, the trial court denied the special motion to strike in its entirety.

[10] For the first time on appeal, Barnes contends the issue of whether the special motion to strike was properly granted as to the Medical Executive Committee is "moot" because the Medical Executive Committee prevailed in its demurrer and has been dismissed as a party. We reject the mootness argument, as a live issue of entitlement to attorney fees as a result of the special motion to strike still exists as to the Medical Executive Committee. (§ 425.16, subd. (c); *White v. Lieberman* (2002) 103 Cal.App.4th 210, 220 [an order sustaining a defendant's demurrer without leave to amend did not moot

11

## II.

## DISCUSSION

### A.  *The Anti-SLAPP Statute*

We begin by setting out some general principles applicable to special motions to strike brought under the anti-SLAPP statute.  "The anti-SLAPP statute is 'designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern.  [Citations.]  To that end, the statute authorizes a special motion to strike a claim "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).)' [Citation.]  [¶]  Litigation of an anti-SLAPP motion involves a two-step process.  First, 'the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.' [Citation.]  Second, for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit." ' [Citation.]  If the plaintiff cannot make this showing, the court will strike the claim." (*Bonni, supra*, 11 Cal.5th at pp. 1008–1009.)[11]

---

that defendant's SLAPP motion, because a prevailing defendant in a special motion to strike is generally entitled to award of attorney fees].)

[11]     We note that the anti-SLAPP statute refers to a "person" and a "defendant" bringing a special motion to strike (§ 425.16, subds. (b)(1), (c)), and it defines the term "defendant" to include " 'cross-defendant' and 'respondent.' " (*Id.*, subd. (h).)  Due to our disposition affirming the trial court's denial of the special motion to strike, we need not, and do not, address whether a real party in interest, such as the Medical Executive Committee, may also bring a special motion to strike.  (See *Rudisill v. California Coastal Com.* (2019) 35 Cal.App.5th 1062, 1072 & fn. 4 [noting that "whether a real

The anti-SLAPP statute identifies four categories of protected activity: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(1)–(4).) The Governing Board and the Medical Executive Committee identify subdivision (e)(1), (2) and (4) of section 425.16 as potentially applicable here.[12]

_____

party in interest in a mandamus proceeding is a 'person' against whom a claim is asserted for purposes of the anti-SLAPP statute has apparently not been addressed in any reported decision," but concluding that for the purpose of deciding whether to award attorney fees to a plaintiff that prevailed in defeating an anti-SLAPP motion, there was a "reasonable basis" for the moving party in the anti-SLAPP motion to adopt that interpretation].) The Medical Executive Committee contends on appeal that the trial court erred in not *separately* addressing the claims against it when evaluating the special motion to strike. However, since the Medical Executive Committee was sued solely as a real party in interest to enable the court to order relief that impacts the Medical Executive Committee, the substantive basis for Barnes's claims for relief as to that party are identical to the substantive basis for the claims for relief against the Governing Board. No separate analysis is required to determine whether the claims against the Medical Executive Committee, as real party in interest, arise from speech protected by the anti-SLAPP statute.

[12] The Governing Board and the Medical Executive Committee contend that subdivision (e)(1) and (2) of section 425.16 apply because Barnes's peer review proceeding was an "official proceeding authorized by law" (*ibid.*),

13

"Analysis of an anti-SLAPP motion is not confined to evaluating whether an *entire* cause of action, as pleaded by the plaintiff, arises from protected activity or has merit. Instead, courts should analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion." (*Bonni, supra*, 11 Cal.5th at p. 1010, italics added.) Put another way, "*particular* alleged acts giving rise to a claim for relief may be the object of an anti-SLAPP motion." (*Baral, supra*, 1 Cal.5th at p. 395.) If a court strikes particular claims for relief within a cause of action under the anti-SLAPP statute, the plaintiff "may no longer seek to impose liability on defendants for having engaged in th[o]se protected acts." (*Bonni,* at p. 1019.) However, the underlying *factual allegations* for the stricken claims will still be admissible to prove any claims for relief that survive the special motion to strike. (*Ibid.*)

A trial court's order denying a special motion to strike is subject to a de novo standard of review. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.) " '[O]ur job is to review the trial court's ruling, not its reasoning.' " (*Trinity Risk Management, LLC v. Simplified Labor Staffing Solutions, Inc.* (2021) 59 Cal.App.5th 995, 1002.)

---

during which, or in connection with which, certain written or oral speech occurred. They allege that subdivision (e)(4) of section 425.16 applies on the ground that, during Barnes's peer review proceeding, statements were made about the " 'public issue' of 'the qualifications, competence, and professional ethics of a licensed physician.' " (Quoting *Yang v. Tenet Healthcare Inc.* (2020) 48 Cal.App.5th 939, 947.)

B.    *Hospital Peer Review Proceedings*

To better understand the context in which this action arose, we next examine the nature of hospital peer review proceedings.

"In California, hospitals are composed of an administrative governing body that oversees hospital operations and a medical staff that provides medical services and ensures its members provide adequate medical care to patients.  A physician who wishes to practice at a hospital must maintain staff privileges.  The termination of staff privileges can significantly limit the physician's ability to practice medicine.  For that reason, before staff privileges can be terminated, the physician must be afforded certain procedural protections, including the opportunity for review of the termination decision."  (*Natarajan v. Dignity Health* (2021) 11 Cal.5th 1095, 1102 (*Natarajan*).)  That process is known as "peer review."  (*Ibid.*; see also *Bonni, supra*, 11 Cal.5th at pp. 1012–1013 ["medical peer review is the process by which a hospital's medical staff evaluates fellow physicians' professional competence"].)

"Though originally adopted by the profession as a purely private process, peer review is now mandated by statute [citations]  . . . ."  (*Bonni, supra*, 11 Cal.5th at p. 1013.)  Specifically, in 1989, "[t]he Legislature . . . codified the common law fair procedure doctrine in the hospital peer review context by enacting Business and Professions Code sections 809 to 809.8."  (*El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 988.)  "The two primary goals of the peer review statute are 'to protect the health and welfare of the people of California by excluding through the peer review mechanism "those healing arts practitioners who provide substandard care or who engage in professional misconduct" ' and 'to protect competent practitioners from being barred from practice for arbitrary or discriminatory

15

reasons.' " (*Natarajan, supra*, 11 Cal.5th at p. 1103.) "A hospital's decisions resulting from peer review proceedings are subject to judicial review by administrative mandate. (Bus. & Prof. Code, § 809.8.) Thus, the Legislature has accorded a hospital's peer review decisions a status comparable to that of quasi-judicial public agencies whose decisions likewise are reviewable by administrative mandate." (*Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 200 (*Kibler*).)

Under applicable law, "[t]he medical staff must adopt written bylaws 'which provide formal procedures for the evaluation of staff applications and credentials, appointments, reappointments, assignment of clinical privileges, appeals mechanisms and such other subjects or conditions which the medical staff and governing body deem appropriate.' " (*Mileikowsky, supra*, 45 Cal.4th at p. 1267.) The JFK Bylaws specifically set forth the peer review procedures that apply when the Medical Executive Committee considers whether to take corrective action against a member of the medical staff. Those procedures include the steps of (1) an investigation by the Medical Executive Committee after receiving information about the "conduct, performance, or competence of practitioners who hold privileges at JFK" to decide whether to recommend adverse action; (2) the physician's right to request a hearing before the JRC to review the recommendation to take adverse action, with the JRC composed of at least three members of the medical staff, whom the physician has had "a reasonable opportunity to question and challenge" with respect to impartiality; (3) the physician's right to appeal the JRC's decision to the Appeal Board "composed of not less than 3 members of the Governing Board," which decides "whether the Governing Board should affirm, modify, or reverse the judicial review committee decision"; and (4) the Governing Board's issuance of a final decision on

16

whether to affirm the JRC decision, based on a determination that the decision "is supported by substantial evidence, following a fair procedure," and which "shall specify the reasons for the action taken" and "shall include the text of the [805] report which shall be made to the National Practitioner Data Bank and the Medical Board of California."

As relevant here, the JFK Bylaws also provide, "Failure to maintain professional liability insurance shall be grounds for automatic suspension of a practitioner's clinical privileges. Following a written warning of the delinquency, if the practitioner does not provide evidence of required professional liability insurance within ten (10) days, the practitioner's membership and privileges shall be automatically terminated." Further, with respect to an automatic termination, "a hearing, if requested, shall be limited to the question of whether the grounds for automatic suspension as set forth below have occurred."

C.    *Application of the Anti-SLAPP Statute's First Prong to Barnes's Claims in the Petition*

We now turn to an analysis of whether, as the Governing Board and the Medical Executive Committee contend, certain of the claims for relief in the Petition fall within the scope of the anti-SLAPP statute. In conducting our first-prong analysis, we consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2); see also *Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.)

Our Supreme Court has twice examined the extent to which claims for relief based on hospital peer review proceedings are within the scope of the anti-SLAPP statute. First, in *Kibler*, our Supreme Court held that "a hospital's peer review qualifies as 'any other official proceeding authorized by law' under subparagraph (2) of subdivision (e) [of section 425.16] and thus a

17

lawsuit arising out of a peer review proceeding is subject to a special motion under section 425.16 to strike the SLAPP suit." (*Kibler, supra*, 39 Cal.4th at p. 198.) *Kibler* specifically examined whether the anti-SLAPP statute applied to a doctor's lawsuit against a hospital and certain physicians and nurses, in which he sought "damages under a variety of theories including defamation, abuse of process, and interference with [the doctor's] practice of medicine" after the hospital summarily terminated his medical staff privileges, which were later reinstated after the doctor agreed to certain corrective measures. (*Id.* at p. 196.)[13] However, the issues reached in *Kibler* were limited. *Kibler* "did not address whether every aspect of a hospital peer review proceeding involves protected activity, but only whether statements in connection with but outside the course of such a proceeding can qualify as 'statement[s] . . . in connection with an issue under consideration' in an 'official proceeding.' " (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1070 (*Park*).)

Next, in *Bonni*, our Supreme Court considered "the scope and limits" of *Kibler*'s holding that the anti-SLAPP statute's protections extend to speech and petitioning in connection with hospital peer review. (*Bonni, supra*, 11 Cal.5th at p. 1004.) Specifically, *Bonni* concerned a lawsuit brought by a

_____

[13] The allegations in *Kibler* concerned only "oral or written statements or writings made 'in connection with' (but not during the course of) the hospital's peer review proceeding," and thus our Supreme Court analyzed only the applicability of subdivision (e)(2) of section 425.16. (*Kibler, supra*, 39 Cal.4th at p. 198.) *Kibler* expressly declined to reach the question of whether "hospital peer review proceedings qualify as 'conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest' " within the meaning of subdivision (e)(4) of the anti-SLAPP statute. (*Id.* at p. 203.)

18

doctor who had been subject to peer review proceedings at two hospitals. He sued those hospitals, affiliated entities and eight individual doctors who participated in the peer review proceedings. (*Id.* at pp. 1004–1007.) The doctor's lawsuit did not seek relief from the outcome of the peer review proceedings. Instead, the lawsuit primarily sought to impose liability based on claims that the defendants had wrongfully *retaliated* against the doctor in violation of the whistleblower protections of Health and Safety Code section 1278.5 by "summarily suspending him, reporting his suspensions to the state medical board, subjecting him to lengthy and humiliating peer review proceedings, defaming him, and ultimately terminating his hospital privileges." (*Id.* at p. 1007.)

*Bonni, supra*, 11 Cal. 5th 995 addressed the extent to which the retaliatory conduct alleged by the doctor fell within the protection of the anti-SLAPP statute. *Bonni* concluded that "[w]hile some of the forms of retaliation alleged in the complaint—including statements made during and in connection with peer review proceedings and disciplinary reports filed with official bodies—do qualify as protected activity, the discipline imposed through the peer review process does not." (*Id.* at p. 1004.)

In explaining this decision, our Supreme Court in *Bonni* relied upon its recent decision in *Park, supra*, 2 Cal.5th 1057, which concerned a professor's lawsuit alleging that a university's act of denying him tenure constituted national-origin discrimination for which the university was liable under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.). (*Park*, at pp. 1061, 1068.) As *Bonni* explained, *Park* established that "the anti-SLAPP statute protects speech and petitioning activity taken in connection with an official proceeding, but not necessarily the decisions made

19

or actions taken as a result of those proceedings." (*Bonni, supra*, 11 Cal.5th at p. 1014.)

Applying this approach, *Bonni* concluded that "two of the alleged retaliatory actions underlying [the doctor's] complaint—defamation and 'character assassination'—describe quintessential speech activities and thus are protected under section 425.16, subdivision (e)(2) to the extent the speech was made in connection with peer review." (*Bonni, supra*, 11 Cal.5th at p. 1016.) A long list of other alleged retaliatory activity also fell within the scope of section 425.16, subdivision (e)(2): (1) the filing of 805 reports; (2) making an argument to the peer review panel that the doctor's suspension should be upheld; (3) recommending the reversal of certain favorable preliminary findings; and (4) subjecting the doctor to a " 'lengthy and humiliating peer review process,' " which encompassed "essentially everything any defendant said in the course of the peer review process in support of limiting [the doctor's] privileges." (*Bonni,* at pp. 1017–1018.) However, the actual *disciplinary actions* arrived at through the peer review proceedings were not protected, either as speech made in connection with peer review under subdivision (e)(2) of section 425.16 (*Bonni*, at p. 1020), or as " 'any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest' " under subdivision (e)(4) of section 425.16. (*Bonni*, at pp. 1020–1022.)

In their anti-SLAPP motion, the Governing Board and the Medical Executive Committee rely on the distinction, identified in *Bonni*, between speech occurring *during* the peer review proceedings, which fell within the scope of the anti-SLAPP statute in *Bonni*'s analysis, and the disciplinary *decisions* themselves, which did not. According to the Governing Board and

the Medical Executive Committee, the same dichotomy should apply in this case. They contend that all of the allegations in the Petition regarding speech or communicative conduct that occurred during Barnes's peer review proceeding *are* protected by the anti-SLAPP statute, and only the Governing Board's decision to terminate Barnes's medical staff membership *is not* protected. They maintain that the "peer reviewers' speech and conduct in the course of the [Medical Executive Committee's] investigation, recommendations, and peer review hearing that led up to the Governing Board's final decision, as well as rulings made by the Hearing Officer in Dr. Barnes's lengthy hearing" fall within the scope of the anti-SLAPP law.

However, as we will explain, there is a crucial difference between *Bonni* and Barnes's case that is dispositive here. Barnes seeks only to undo the *result* of the peer review proceeding itself on the ground that it was, in several respects, unfair and unlawful. That is why he seeks only writ relief and a declaratory judgment. The evidence concerning the conduct and speech engaged in by the Medical Executive Committee, the JRC, and the hearing officer appear in the Petition *only* because they are evidence of the allegedly unfair and unlawful nature of the peer review proceeding to support Barnes's contention that the result of the peer review proceeding should be reversed.[14] The plaintiff in *Bonni*, in contrast, sought to impose *liability* on a range of defendants because they allegedly used the peer review proceeding, and

---

14    Indeed, in his Petition, Barnes relies *exclusively* upon the identical evidence and arguments about the unfairness and unlawfulness of the peer review proceeding that he presented in his briefing to the Appeal Board. The reliance on identical arguments and evidence in both forums shows that the Petition's allegations regarding the Medical Executive Committee, the JRC, and the hearing officer serve merely *as support* for his attempt to reverse the ultimate decision in the peer review proceeding.

statements made in connection with that proceeding, as a means to retaliate against him.  Unlike in *Bonni*, the wrong that Barnes complains of is the lack of fairness and lawfulness in the peer review proceeding *itself*, not any independent injury that arose from speech or communicative conduct during that proceeding.

The central dispositive legal principle for our analysis is set forth in *Park, supra*, 2 Cal.5th 1057.  Specifically, "a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Id.* at p. 1060.)  "A claim arises from protected activity when that activity underlies or forms the basis for the claim.  [Citations.] Critically, 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.' [Citations.]  '[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute.' [Citations.]  Instead, the focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' " (*Id.* at pp. 1062–1063.)  For the purpose of a first-prong analysis under the anti-SLAPP statute, there is a "distinction between activities that form the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claim." (*Id.* at p. 1064.)

In *Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35 (*Young*), this court conducted a first-prong analysis under the anti-SLAPP statute in a case concerning a petition for a writ of administrative mandamus brought by a doctor challenging a decision made during a hospital peer

22

review proceeding. Although *Young* was decided prior to our Supreme Court's *Park* opinion (*Park, supra*, 2 Cal.5th 1057), it applies legal principles that are consistent with those set forth in *Park* for deciding whether a claim arises from protected speech, and its analysis is instructive here.

In *Young*, the doctor's petition for administrative mandamus challenged a series of decisions made by the hospital board in the course of a peer review proceeding and sought an order entitling the doctor to reinstatement of his medical staff privileges. (*Young, supra*, 210 Cal.App.4th at p. 40.) The specific claim at issue in the hospital's anti-SLAPP motion was the doctor's challenge to the summary suspension of his medical staff privileges, which occurred while the peer review proceeding was ongoing. (*Id.* at pp. 40, 43.) The doctor "sought an order determining that the . . . summary suspension was unjustified, based on improper review of his records, carried out by unqualified committees, and unsupported by substantial evidence, so it should be vacated." (*Id.* at p. 44.)

In conducting a first-prong analysis, *Young* framed the inquiry as "whether the plaintiff is seeking relief from the defendant for its protected communicative acts." (*Young, supra*, 210 Cal.App.4th at p. 55.) Applying that standard, *Young* concluded that the doctor's claim was not protected by the anti-SLAPP statute. *Young* explained that "[n]othing in the anti-SLAPP statute wholly exempts a writ petition against a public entity from its potential coverage of protected speech." (*Id.* at p. 42.)[15] However, the

---

[15] "[I]n an appropriate case, a petition for mandamus may be subject to a special motion to strike just like any other form of action. (See, e.g., *Moraga-Orinda Fire Protection Dist. v. Weir* (2004) 115 Cal.App.4th 477 [mandamus petition seeking to strike or modify ballot argument constituted a SLAPP suit].)" (*San Ramon Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement Assn.* (2004) 125 Cal.App.4th 343, 353 (*San Ramon*).)

doctor's challenge to his summary suspension did not " 'arise' from the [hospital board's] acts in furtherance of its rights of petition or free speech in connection with peer review (a public issue), but rather, the substance of that cause of action ar[ose] from *the statutory provision giving a right to judicial review of a governmental decision.*" (*Young*, at p. 42, italics added.)

*Young* emphasized that the doctor's "request for judicial relief *from* an administrative decision should be distinguished from *requests for damages* that are fundamentally based on alleged injury arising from such peer review activity." (*Young, supra*, 210 Cal.App. 4th at p. 57, italics added.) As *Young* explained, the case law applying the protections of the anti-SLAPP statute to a hospital peer review proceeding were claims in which the doctor sought to impose liability for speech or protected conduct that occurred in connection with a proceeding. (*Ibid.*, citing *Kibler, supra*, 39 Cal.4th 192, *Smith v. Adventist Health System / West* (2010) 190 Cal.App.4th 40, *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65, 80, disapproved in *Park, supra*, 2 Cal.5th at p. 1070.) *Young* concluded that because the plaintiff doctor in the case before it had filed a petition for a writ of administrative mandamus challenging the procedures employed during his summary suspension, the doctor's claim for relief was "*based on and arose out of his statutory rights under section 1094.5*, and [was] separate and different from an action for damages that arose out of the content of the allegedly wrongful peer review statements" in the cases such as *Kibler* and *Smith*. (*Young*, at p. 58, italics added.) Put another way, the doctor's claim for relief was based on "avoidance of fair procedure or his judicial review hearing

---

Similarly, a claim for declaratory relief may also be the subject of an anti-SLAPP motion. (*South Sutter, LLC v. LJ Sutter Partners, L.P.* (2011) 193 Cal.App.4th 634, 665–666.)

rights" rather than on any protected speech occurring during the hospital peer review proceedings. (*Ibid.*) Although the doctor's claim for writ relief may have been " 'triggered' " by certain protected speech in the context of a peer review proceeding, it did not arise from that protected speech because the doctor "principally [sought] judicial relief from actions of an administrative body that denied him a hearing to which he was otherwise entitled." (*Id.* at p. 59.)[16]

Here, as in *Young*, Barnes's claims for relief arose from "statutory provision[s] giving a right to judicial review of a governmental decision" (*Young, supra*, 210 Cal.App.4th at p. 42), rather than from any protected speech made in connection with the peer review proceeding. Barnes alleges a string of reasons why the peer review proceeding was not fairly conducted or

---

[16]    The Governing Board and the Medical Executive Committee do not mention *Young, supra*, 210 Cal.App.4th 35 in their appellate briefing. In their trial court briefing for the special motion to strike, they acknowledged *Young* in a footnote, but they contended that "*Young* has been implicitly overruled" by subsequent case law from our Supreme Court, such as *Bonni, supra*, 11 Cal.5th 995, which they described as holding that "events that occur in the course of an administrative proceeding may be subject to the anti-SLAPP statute." We are not persuaded by the attempt to distinguish *Young*. The significance of *Young* to the instant case is that *Young* discussed the extent to which the anti-SLAPP statute applied to speech-related claims of procedural unfairness and unlawfulness during a hospital peer review proceeding that appear in a petition for a writ of administrative mandamus challenging the result of the peer review proceeding itself. The distinction that *Young* highlights between that type of writ petition and the type of claim for damages discussed in *Kibler, supra*, 39 Cal.4th 192, and other case law involving hospital peer review proceedings, is still relevant and persuasive, even in light of subsequent Supreme Court case law. (Cf. *City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 427 [noting a concern about "chilling citizens' exercise of their right to challenge government action by suing the public entity itself" as opposed to suing individual members of a governing body based on their protected speech or petitioning activity].)

25

was conducted in violation of the applicable procedures. Some of those reasons touch on speech or communicative conduct that occurred during the peer review proceeding. For example, the Petition (1) cites Dr. S.C.'s testimony that he was not subject to a retention agreement; (2) complains about certain hearsay evidence or other testimony and about the propriety of the EXTTI report; and (3) cites rulings communicated by the hearing officer. However, as in *Young*, Barnes's claims for relief are based on "avoidance of fair procedure or his judicial review hearing rights" rather than on any protected speech or conduct that might have occurred during the peer review proceeding. (*Id.* at p. 58.) The fact that certain speech took place during the peer review proceeding merely "provide[s] evidentiary support for the claim" that the peer review proceeding was procedurally unfair and unlawful (*Park, supra*, 2 Cal.5th at p. 1064), but that speech does not, *itself*, form the basis for a claim of entitlement to relief in administrative mandamus, by a traditional writ of mandate, or through declaratory relief. Because the fundamental relief that Barnes seeks is an order that would undo the consequences of the Governing Board's decision to terminate his medical staff membership, Barnes's claims for relief arise from the Governing Board's ultimate decision, not any subsidiary procedural step involving speech.[17]

---

[17]    In their appellate briefing, the Governing Board and the Medical Executive Committee separately discuss the Petition's allegations that Barnes was not afforded the allegedly required notice and a hearing prior to the automatic termination of his medical staff membership due to his failure to maintain professional liability insurance. They contend that the allegation about the lack of notice "relates to speech" and thus brings the claim within the protections of the anti-SLAPP law. We reject the argument. As with the claims challenging the termination of his medical staff privileges for the reasons set forth in the First Amended Notice of Charges, Barnes's complaint about the automatic termination arises from the alleged procedural

26

Moreover, if we were to accord anti-SLAPP protection to Barnes's attempt to obtain judicial review of the procedural fairness and lawfulness of the peer review proceeding merely because that proceeding involved speech, the result would be to needlessly discourage judicial review of hospital peer review proceedings. As one court observed in a similar circumstance, "[m]any of the public entity decisions reviewable by mandamus or administrative mandamus are arrived at after discussion and a vote at a public meeting. [Citations.] If mandamus petitions challenging decisions reached in this manner were routinely subject to a special motion to strike . . . the petitioners in every such case could be forced to make a prima facie showing of merit at the pleading stage. While that result might not go so far as to impliedly repeal the mandamus statutes . . . it would chill the resort to legitimate judicial oversight over potential abuses of legislative and administrative power, which is at the heart of those remedial statutes. It would also ironically impose an undue burden upon the very right of petition for those seeking mandamus review in a manner squarely contrary to the underlying legislative intent behind section 425.16." (*San Ramon, supra*, 125 Cal.App.4th at pp. 357–358.) As another court elaborated on the observation made in *San Ramon*, "The same may be said of a declaratory relief action that challenges the validity of governmental conduct. And the chilling effect of requiring the plaintiff in an action for a writ of mandate or declaratory relief to make a prima facie showing of merit at the pleading stage is of

---

unfairness and unlawfulness of that termination proceeding, not from any speech that occurred during it. Any specific allegations about the nature of the notice afforded in connection with that termination, to the extent it can be characterized as protected speech, serves only as *evidence* of the alleged procedural unfairness but does not constitute the basis for the claim for relief.

particular concern because a defendant who prevails on an anti-SLAPP motion is entitled to an award of attorney fees.  (See § 425.16, subd. (c).)" (*Graffiti Protective Coatings, Inc. v. City of Pico Rivera* (2010) 181 Cal.App.4th 1207, 1225.)  Identical observations can be made regarding the approach advocated by the Governing Board and the Medical Executive Committee in this case.  Hospital peer review proceedings invariably involve speech.  If a doctor who seeks judicial review of the fairness and lawfulness of a hospital peer review proceeding through a writ petition or a declaratory relief action has to be concerned about a special motion to strike simply because some of the allegedly unfair procedures involved speech, it would chill the resort to judicial oversight of hospital peer review proceedings.  That result is disfavored because the Legislature has unequivocally intended to provide for judicial review of hospital peer review proceedings.  (Bus. & Prof. Code, § 809.8.)

We accordingly conclude that the trial court properly denied the special motion to strike, as none of the claims targeted by that motion arise from speech protected by the anti-SLAPP statute.  Because we resolve this appeal on a first-prong analysis, we need not, and do not, address whether Barnes can establish a probability he would prevail on any of the Petition's allegations targeted by the special motion to strike.

## DISPOSITION

The order denying the special motion to strike is affirmed.

IRION, J.

WE CONCUR:

O'ROURKE, Acting P. J.

BUCHANAN, J.