Filed 2/29/24; certified for publication 3/19/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| VARDUI ASIRYAN,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>MEDICAL STAFF OF GLENDALE ADVENTIST MEDICAL CENTER,<br><br>Defendant and Respondent. | B316313<br>(Los Angeles County<br>Super. Ct. No. 19STCV02196) |
| VARDUI ASIRYAN,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>GLENDALE ADVENTIST MEDICAL CENTER et al.,<br><br>Defendants and Respondents. | B317728<br>(Los Angeles County<br>Super. Ct. No. 19STCV02196 |

APPEALS from the judgment and an order of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge. Affirmed (appeal No. B316313); affirmed in part and reversed in part with directions (appeal No. B317728).

Fenton Law Group, Nicholas D. Jurkowitz and Dennis E. Lee for Plaintiff and Appellant.

Cole Pedroza, Kenneth R. Pedroza and Scott M. Klausner for Defendants and Respondents.

————————————————

Plaintiff Vardui Asiryan is a licensed obstetrician and gynecologist who around November 2015 obtained medical staff privileges at defendant Glendale Adventist Medical Center dba Adventist Health Glendale (GAMC). Defendant Medical Staff of Glendale Adventist Medical Center (the Medical Staff) "is a separate legal entity, an incorporated association, which is required to be self-governing and independently responsible from [GAMC] for its own duties and for policing" "physicians who are given staff privileges to admit patients and practice medicine [at GAMC]." (*Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1130, fn. 2.) In October 2018, the Medical Staff suspended Asiryan's privileges at GAMC without holding a hearing or giving Asiryan prior notice. Asiryan resigned those privileges the day she learned of the decision.

Asiryan sued GAMC and the Medical Staff (collectively, the defendants), alleging they failed to comply with statutory and common law procedural requirements in connection with suspending her privileges at GAMC. She further alleged that the Medical Staff lied to her regarding their obligations to report her suspension and resignation to the state licensing board, and that this violated the staff's statutory and common law notice obligations.

Asiryan appeals from a judgment in the Medical Staff's favor. She argues that the court reversibly erred when, based on its incorrect interpretation of the relevant case law and the

2

Business and Professions Code sections addressing due process requirements for hospital peer review (see Bus. & Prof. Code, § 809 et seq.),[1] the court (1) granted a motion for nonsuit on her claim under the common law doctrine of fair procedure and (2) rejected Asiryan's proposed jury instructions. She further argues the court abused its discretion when it denied Asiryan's request, made after trial had commenced, to amend her complaint. Finally, Asiryan also appeals from the court's order awarding defendants attorney fees under section 809.9, the relevant attorney fees statute. She argues the court erred in concluding her peer review claims were without foundation and unreasonable for purposes of that section.

We hold that the trial court correctly concluded the code is the sole source of procedural protections in connection with hospital peer review, and that the common law doctrine of fair procedure does not supplant those protections with additional guarantees. Based on this interpretation, we conclude the court correctly granted the nonsuit on Asiryan's common law peer review claims and correctly rejected her proposed jury instructions regarding peer review. We further hold that the court did not reversibly err in denying Asiryan leave to amend. For these reasons, we affirm the judgment.

We reach a different conclusion regarding Asiryan's appeal from the order awarding attorney fees. Given the court's rulings denying certain portions of defendants' summary judgment and nonsuit motions as to the Medical Staff, we conclude a hypothetical reasonable attorney could have deemed Asiryan's peer review claims against the Medical Staff tenable and reasonably decided

---

[1] Unless otherwise indicated, all unspecified statutory references are to the Business and Professions Code.

3

to take them to trial.  This same logic does not apply to the fees awarded to GAMC, because the court disposed of the claims against GAMC on summary judgment.  We therefore reverse the court's fee order to the extent it awards fees to the Medical Staff, but affirm the order as it applies to GAMC.

## BACKGROUND

**A.** ***Legal Background:  Code Sections Governing Hospital Peer Review and Related Reporting Requirements***

"Under [California] law, a licensed hospital facility must have 'a formally organized and self-governing medical staff responsible for "the adequacy and quality of the medical care rendered to patients in the hospital." (Cal. Code Regs., tit. 22, § 70703, subd. (a).)' (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 10 . . . , italics omitted; *Oliver v. Board of Trustees* (1986) 181 Cal.App.3d 824, 826–827 . . . .)  The medical staff acts primarily through a number of peer review committees, which, along with other responsibilities, assess the performance of physicians currently on staff . . . .  (Cal. Code Regs., tit. 22, § 70703, subds. (b) & (d).)" (*Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 616 (*Unnamed Physician*).)

Several code sections address the efforts of such "peer review bod[ies,]" a term statutorily defined to include the "medical or professional staff of any health care facility or clinic" (§ 805, subd. (a)(1)(B)(i)), regarding the discipline and oversight of licensed physicians and other health care provider " '[l]icentiate[s]' " (§ 805, subd. (a)(2)) affiliated with the facility or clinic.  (See generally §§ 805–809.9.)  The code defines "[p]eer review" in this context as, inter alia, the process of the staff reviewing "the basic qualifications, staff privileges, employment, medical outcomes,

4

or professional conduct of licentiates" for disciplinary, investigatory, or quality improvement purposes. (§ 805, subd. (a)(1)(A)(i).) For ease of reference, we will refer to these provisions of the code (§§ 805–809.9) as the California peer review statute. We briefly summarize the portions of this statute most relevant to the instant appeal.

A peer review body or the administration of the body's affiliated hospital must file a " '805 report' " (§ 805, subd. (a)(7)) to the "relevant [licensing] agency" regarding a licentiate when, "for a medical disciplinary cause or reason," it takes any of several actions outlined in the statute. (§ 805, subds. (b)(1)–(b)(3).) Specifically, a section 805 report is required when a licentiate's "application for staff privileges or membership is denied or rejected" (§ 805, subd. (b)(1)), a licentiate's "membership, staff privileges, or employment is terminated or revoked" (§ 805, subd. (b)(2)), or "[r]estrictions are imposed, or voluntarily accepted, on staff privileges, membership, or employment for a cumulative total of 30 days or more for any 12-month period" (§ 805, subd. (b)(3)). "An 805 report shall also be filed within 15 days following the imposition of summary suspension of staff privileges, membership, or employment, if the summary suspension remains in effect for a period in excess of 14 days." (§ 805, subd. (e).) Finally, a section 805 report is also required when, "after receiving notice of a pending investigation initiated for a medical disciplinary cause or reason," a licentiate "[r]esigns or takes a leave of absence from membership, staff privileges, or employment." (§ 805, subd. (c) & (c)(1).)

The statute also sets forth certain notice and hearing rights for licentiates "who [are] the subject of a final proposed action of a peer review body for which a report is required to be filed under [s]ection 805." (§ 809.1, subd. (a); see *Unnamed Physician, supra*,

5

93 Cal.App.4th at p. 616.)  Namely, section 809.1 "entitle[s]" the subject licentiate "to written notice . . . [of] the 'final proposed action'" (§ 809.1, subd. (a)), which notice must also inform the licentiate that a section 805 report will be filed and that the "licentiate has the right to request a hearing on the final proposed action" (§ 809.1, subd. (b)(3)) and "[t]he time limit, within which to request such a hearing."  (§ 809.1, subd. (b)(4); see § 809.1, subd. (b) & (b)(1)–(4).)  Further, "[i]f a hearing is requested on a timely basis, the peer review body [must comply with additional written notice requirements regarding the hearing]."  (§ 809.1, subd. (c).)  The statute also specifically guarantees several elements of due process be incorporated into such hearings, such as the right to call and confront witnesses and to present evidence, and the right to a written decision by a trier of fact.  (See §§ 809.1, subds. (a) & (b), 809.2, subd. (a), 809.3, subds. (a)(3), (4) & (b)(1), (2), (3), 809.4, subd. (a)(1); see also *Unnamed Physician*, *supra*, 93 Cal.App.4th at p. 617 ["[t]he statutory scheme delegates to the private sector the responsibility to provide fairly conducted peer review in accordance with due process, including notice, discovery and hearing rights, all specified in the statute"]; see also §§ 809–809.8.)  "Notwithstanding [any of these procedural guarantees, however,] a peer review body may immediately suspend or restrict clinical privileges of a licentiate where the failure to take that action may result in an imminent danger to the health of any individual, provided that the licentiate is subsequently provided with the notice and hearing rights set forth in [s]ections 809.1 to 809.4, inclusive."  (§ 809.5, subd. (a).)

6

**B.** *Factual Background*

**1.** *Peer review efforts of the Medical Staff at GAMC regarding Asiryan before October 13, 2018*

GAMC has in place procedures whereby anyone affiliated with GAMC (for example, nurses or medical assistants) may submit a report (referred to as a "RADAR" report) about perceived issues regarding a physician's care. Rachel Van Houten, Director of Medical Staff Services, reviews the reports and forwards them to the appropriate person to be addressed. Van Houten typically refers matters involving the quality of a physician's care to the chair of that physician's department. A GAMC "credentials policy" (capitalization omitted) sets forth the procedures for further addressing such concerns. The chair of the perinatal/gynecology department (the department) at the time Asiryan was a member thereof was Dr. Selena Lantry.

Between 2017 and 2018, Van Houten received between 13 and 15 RADAR reports related to Asiryan from nurses with whom Asiryan worked. During department meetings regarding these reports, Asiryan's colleagues evaluated these cases and agreed, following a vote, that one of them presented clinical care concerns. Asiryan was informed of this via a November 2017 "educational letter" that did not require further action on her part or entail any immediate consequences. In a February 8, 2018 letter, the "Multispecialty Peer Review Committee" informed Asiryan that it had reviewed four of her cases and identified a "pattern" of conduct that the committee "scored" as "non-compliant with medical staff policies" and "process improvement opportunity." (Capitalization omitted.) The letter further stated that "in light of the information received, [the] committee [had] determined that an

ongoing evaluation of [Asiryan's] cases and documentation will be performed for a period of time until it can be determined that [the] practice [described in the letter had] discontinued" and informed Asiryan that "continued instances of non-compliance will be referred to the Medical Executive Committee for follow-up."

On February 27, 2018, the department sent Asiryan a letter informing her that the department had concerns— unrelated to the practices addressed in the previous letters—regarding another of her cases and asked Asiryan for a written response to explain her decision-making.

Around July 11, 2018, Asiryan received a letter from the department informing her that the department had initiated a "Focused Professional Practice Evaluation" (FPPE) of Asiryan's "procedural and cognitive skills and [her] interpersonal skills and behavior." The letter listed eight actions between February 2018 and June 2018 giving rise to the FPPE and explained the FPPE process would involve an "ad hoc" committee reviewing Asiryan's patient records and reporting findings to the department.

Via a September 12, 2018 letter, the chairperson of the ad hoc committee, Dr. E. Laurence Spencer-Smith, informed Asiryan that the committee had "reviewed several of [her] cases and [had] a high level of concern relating not only to patient safety but also [her] professional demeanor, interpersonal relationships, and communication with other members of the department and hospital staff" (capitalization omitted) as well as about "medical documentation issues" regarding which she had been previously admonished. The letter described in detail several cases in which Asiryan "appear[ed]" to have "deviated from the standard of care and or may have subjected patients to either adverse outcomes or near misses." The letter further informed Asiryan that she was required to appear before the committee on October 18, 2018 and be

8

prepared to discuss the cases identified, and to submit a written response.

### 2. *Events of October 13–15, 2018*

On October 13, 2018, Asiryan was scheduled to perform a delivery via Cesarean section (C-section). Lantry was present for the procedure. The baby was small in size and premature at 30 weeks gestation. The baby slipped from Asiryan's hands and back into the womb several times before it was successfully delivered. Evidence at trial included varying accounts as to Asiryan's demeanor during the delivery—namely, the extent to which she remained calm or became panicked and anxious—and as to whether she required Lantry's assistance to deliver the child. After delivery, the child required resuscitation, intubation, and treatment from the Neonatal Intensive Care Unit.

On October 14, 2018, the day after the delivery, Asiryan had a conversation with Lantry, during which Asiryan stated she was willing to resign to avoid possible harm to her reputation and a section 805 report.

On October 15, 2018, Lantry met with the outgoing chief of staff, Dr. Harlan Gibbs, and Van Houten. At this meeting, Lantry and Gibbs determined that Asiryan posed an "imminent danger to patient safety."

### 3. *October 16, 2018 meeting regarding Asiryan's suspension and resignation*

On October 16, 2018, Lantry met with Dr. Serineh Melidonian, the then-acting chief medical officer, Van Houten, Gibbs, and a GAMC hospital attorney. During this meeting, the group decided to suspend Asiryan's medical staff privileges. Van Houten sent Asiryan a text message later that day instructing Asiryan to attend a meeting that evening.

That evening, Asiryan met with incoming chief of staff Dr. Lukas Alexanian, Melidonian, Lantry, and Van Houten. The group informed Asiryan that her behavior during the October 13th C-section had caused concern about her ability to safely care for patients, and that as a result, her staff privileges were being summarily suspended pending an investigation.

What the attendees of this meeting said regarding the alternative option of Asiryan resigning her privileges, and what that option would mean in terms of GAMC's reporting requirements, was the topic of conflicting testimony at trial. As noted, a hospital must file a section 805 report with the state licensing board when a physician resigns from a medical staff amid an investigation into his or her clinical competency, whereas temporary suspension of a physician's privileges need not be reported unless it remains in effect for longer than 14 days. (§ 805, subds. (b), (c) & (e).) According to Asiryan, GAMC misrepresented these reporting requirements to her at the meeting, telling her that unless Asiryan resigned her staff privileges, GAMC would summarily suspend her, and that her suspension—but not her resignation—would result in a section 805 report. According to Lantry, Melidonian, and Van Houten, however, Lantry informed Asiryan during the meeting that Asiryan had already been suspended at the time of the meeting, and that if she voluntarily resigned, she *would* be reported to the state medical board.[2]

---

[2] Van Houten testified in detail about explaining the various reporting requirements to Asiryan during the meeting. Van Houten further testified that, in the course of this explanation, Van Houten told Asiryan that if her summary suspension lasted more than 14 days and was upheld by the Medical Staff, the resulting section 805 report would need to contain details about the concerns underlying the suspension, whereas a section 805 report regarding

10

During the October 16 meeting, the group denied Asiryan's request that she be permitted 24 hours before her suspension would go into effect so she could consult a lawyer and decide whether to resign. Asiryan testified she was not given any documents during the meeting, nor were any reviewed. At the conclusion of the meeting, Asiryan stated her decision to resign her medical privileges at GAMC. She testified at trial, however, that if she had understood she had a right to contest the summary suspension, she would have exercised that right. Van Houten typed a resignation letter at the computer in her nearby office, which Asiryan then signed.

GAMC then filed a section 805 report with the Medical Board of California, stating that "[f]ollowing notice of an impending investigation based on information indicating medical disciplinary cause or reason" Asiryan had "resigned from the Medical Staff." The report further stated that Asiryan "was the subject of an ongoing investigation concerning issues related to [her] procedural and cognitive skills" and "based on facts particular and specific to [her] care and professional conduct and related to medical disciplinary cause." GAMC filed a report to the same effect with the National Practitioner Data Bank.

C.    *Relevant Procedural History*

Asiryan filed suit against GAMC and the Medical Staff based on her summary suspension and the events surrounding it. She alleged that GAMC and the Medical Staff had tricked her into resigning her staff privileges during the October 16, 2018 meeting by misrepresenting their section 805 reporting obligations. She

_____

a resignation would state merely that Asiryan resigned from the Medical Staff during a pending investigation.

11

further alleged that GAMC and the Medical Staff had denied her the due process owed her in connection with her suspension. On these bases, she asserted causes of action for violation of the California peer review statute, violation of the common law right to fair procedure, intentional infliction of emotional distress, and tortious interference with prospective economic advantage.

### 1. *Pretrial dispositive motions*

Defendants demurred to Asiryan's second amended complaint arguing, inter alia, that a summary suspension did not trigger any notice or hearing rights. "[T]he [c]ourt [could not] make a determination based on the pleadings alone as to whether this case involved a summary suspension, a resignation, or a final determination by a peer review body" and on this basis overruled the demurrer as to all but the economic interference cause of action.

Asiryan filed a third amended complaint, this time omitting the economic interference claim, and the Medical Staff and GAMC moved for summary judgment. The court found that Asiryan's claims were based solely on conduct by "the Medical Staff, which is a separate legal entity" from GAMC, and granted summary judgment to GAMC. In discussing Asiryan's statutory claim against the Medical Staff, the court noted that the California peer review statute "protections are not triggered by a summary suspension," and that a summary suspension "does not give rise to notice and hearing rights described in the statute; rather, such rights need only be 'subsequently provided' to the affected physician." The court nevertheless rejected defendants' argument that this warranted summary judgment in their favor on Asiryan's California peer review statute claim, because the court viewed that claim as "aris[ing] from [Asiryan's] allegation[s] that she was induced to give up her right to a hearing on whether [the] hospital

12

privileges should be terminated or restricted by a representation made to her by . . . the [Medical Staff] . . . that, if she resigned voluntarily, [GAMC] would not file a report to the California Medical Board." (Underscoring omitted.) Because a factual dispute existed on this issue, the court denied the summary judgment motion as to the statutory and common law peer review claims against the Medical Staff, as well as the intentional infliction of emotional distress (IIED) claim against them, which the court likewise characterized as based on this alleged misrepresentation.

### 2. *Pretrial discussions of Asiryan's legal theories and related proposed jury instructions*

The parties discussed the nature of Asiryan's statutory and common law fair procedure causes of action at length during pretrial status conferences in ways that are significant for the issues Asiryan raises on appeal. We therefore summarize these in some detail.

At multiple conferences, the court stated its view that the common law of fair procedure did not offer protections beyond those set forth in the California peer review statute, and that the only way the Medical Staff may have denied Asiryan those statutory protections was by allegedly misrepresenting to her the consequences of her suspension. In the context of discussing jury instructions and Asiryan's proposed special verdict form during an April 16, 2021 conference, the court stated it "[did not] think that [Asiryan] [had] a [common law of fair procedure] cause of action," because "[i]f there is such a cause of action, it's been superseded in this particular case by the statutory procedures." The court further stated that "the [California peer review] statute itself . . . gives the exclusive definition of her rights or under the fair procedure argument" and "permits a summary suspension without a hearing."

13

In response, Asiryan's counsel represented to the court that the "suspension . . . [is] not what the lawsuit is based on. The violation of her procedural rights is based on what occurred after that suspension took place, that she was lied to, and she was tricked into giving up her rights under the code that would have existed because they lied to her and told her false statements." Counsel argued this violated the statute's notice requirements in that, after being summarily suspended, Asiryan "need[ed] to be provided proper notice under her rights of what's going to happen and certainly cannot be tricked and lied to about those rights." Asiryan described the misrepresentations she claimed were made to her at the meeting as the Medical Staff both "fail[ing] to notify [Asiryan] of her rights" and "[lying] to her about her rights."

At subsequent conferences, however, Asiryan claimed that other purported defects in the process the Medical Staff afforded her provided the basis for her peer review claims—namely, that "the suspension was wrong because it was motivated by the wrong motive" and that "the procedure [was] wrongful" "[p]artly" "because they didn't tell [Asiryan] she's been temporarily suspended" and because the Medical Staff did not provide her with any documentation during the meeting.

At a June 21, 2021 conference, the trial court opined that Asiryan's case seemed to be a misrepresentation case, though it had not been pleaded as such. At a July 30, 2021 status conference, the court continued to seek clarification on "exactly what . . . the violation [of section 809]" that Asiryan was alleging was, if not the misrepresentations regarding notice.

In August 2021, after several rounds of edits, the court rejected Asiryan's proposed special jury instructions to the extent they were inconsistent with the interpretation of the California peer review statute the court had described during the pretrial

14

conferences: namely, its interpretation of the statute as permitting summary suspension without a hearing or notice at the time of the suspension, and its view that the common law did not provide protections in the hospital peer review context beyond those provided for in the statute.

### 3. *Motions for nonsuit and leave to amend complaint*

The day before trial began, in the context of continuing discussions about jury instructions, Asiryan's counsel represented to the court that Asiryan "[was] contemplating amending the complaint to conform to proof for fraud" and offered to prepare an amendment. The court stated that it was "not going to allow an amendment now" and that Asiryan was "prejudicing the trial by changing [her] causes of action."

The next day, at the end of opening arguments, the Medical Staff moved for nonsuit on Asiryan's claim under the California peer review statute on the basis that Asiryan had not alleged a violation of that statute, and on her common law claim "as being duplicative of the [section] 809 claim." The trial court denied the motion as to the statutory claim because the court saw a potential basis for such a claim in the alleged misrepresentations to Asiryan. It deferred a ruling on the common law claim to avoid the need for further opening arguments.

On the afternoon of the fourth day of trial, after the defense had rested its case, Asiryan filed a motion to amend her complaint to add a cause of action for fraud—specifically, a cause of action that she was "fraudulently induced to resign," through which she would seek "ordinary tort damages" flowing from the "resignation that she was induced to taking." The court expressed concern that Asiryan had not offered evidence to support a claim for such economic damages. The court denied the motion because it was

15

"untimely," would "destroy[ ] the trial [the parties] [had] had so far," was "not supported by evidence that's been admitted" and "fundamentally changed the issues in [the] case."

The Medical Staff then renewed its motion for nonsuit on Asiryan's common law claim. The court granted the motion.

### 4. *Verdict*

The jury returned a verdict in the Medical Staff's favor on all claims. In connection with the intentional infliction of emotional distress claim, the jury specifically found that the Medical Staff did not "tell Dr. Asiryan during the meeting on October 16, 2018 . . . that if she resigned her medical staff privileges, the Medical Staff would not report her resignation to either the Medical Board of California or the National Practitioner Data Bank."

Defendants moved for an award of attorney fees. The court partially granted the motion in a postjudgment order.

Asiryan timely appealed both the judgment and the order awarding attorney fees. We granted the parties' joint motion to consolidate the two appeals for all purposes.

## DISCUSSION

On appeal, Asiryan argues the court erroneously concluded that the California peer review statute provides the sole source of procedural requirements in the hospital peer review context, and thus reversibly erred when, based on this conclusion, the court granted a nonsuit on her common law claim and rejected certain of her proposed jury instructions. She further argues that the court abused its discretion in denying her leave to amend her complaint to include a fraud claim, and in awarding defendants attorney fees. We address each of these arguments in turn below.

16

**A.** ***The Trial Court Correctly Interpreted the California Peer Review Statute and Did Not Err When, Based Thereon, It Rejected Asiryan's Jury Instructions and Granted a Nonsuit on Her Common Law Claim***

**1.** ***In the hospital peer review context, the common law of fair procedure does not require additional protections beyond those in the California peer review statute***

Asiryan's argument that the court incorrectly interpreted the intersection between the California peer review statute and the common law of fair procedure presents a legal issue we review de novo.

"A hospital's duty to provide certain protections to a physician in proceedings to deny staff privileges was grounded originally in the common law doctrine of fair procedure." (*El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 986 (*El-Attar*).) Generally summarized, this broadly-applicable doctrine provides that "judicial intervention in a private association's membership decisions is warranted ' "where the considerations of policy and justice [are] sufficiently compelling" ' [citations] [and that] '[w]henever a private association is legally required to refrain from arbitrary action, the association's action must be both substantively rational and procedurally fair.' [Citation.]" (*Ibid.*, quoting *Pinsker v. Pacific Coast Society of Orthodontists* (1974) 12 Cal.3d 541, 550 (*Pinsker*).) Courts began applying this broad doctrine in the context of hospital credentialing and peer review decisions in the late 1970s. (See *Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802, 815 ["a physician may neither be refused admission to, nor expelled from, the staff of a hospital, whether public or private, in the absence of a procedure comporting with the minimum

17

common law requirements of procedural due process," italics omitted]; see also *El-Attar, supra*, at p. 987.)

In 1989, "[t]he Legislature . . . codified the common law fair procedure doctrine in the hospital peer review context by enacting . . . [the California peer review statute]." (*El-Attar, supra*, 56 Cal.4th at p. 988.) Our state Supreme Court summarized the circumstances and purpose of this codification as follows: the California peer review statute was "passed in response to the federal Health Care Quality Improvement Act of 1986 [HCQIA] (42 U.S.C. §§ 11101–11152), which provides immunity from money damages for peer review actions taken in compliance with the [HCQIA's] requirements. . . . [the California peer review statute] established the minimum procedures that hospitals must employ in certain peer review proceedings. [Citations.] . . . [T]he 'primary purpose of the peer review process' codified in this legislation is 'to protect the health and welfare of the people of California by excluding through the peer review mechanism "those healing arts practitioners who provide substandard care or who engage in professional misconduct." (§ 809, subd. (a)(6).)' [Citation.] A second purpose of the legislation, which is 'also if not equally important, is to protect competent practitioners from being barred from practice for arbitrary or discriminatory reasons.' [Citation.] [¶] Thus, [California's] peer review statute, like the common law fair procedure doctrine that preceded it, 'establishes minimum protections for physicians subject to adverse action in the peer review system.' [Citation.] The statutory scheme guarantees, among other things, a physician's right to notice and a hearing before a neutral arbitrator or an unbiased panel." (*El-Attar, supra*, at p. 988.)

Asiryan contends that "the common law right of fair procedure remains a separate and viable claim for a physician

against a hospital and its medical staff, regardless of the enactment of [the California peer review statute], and either or both claims may be pursued at the physician's election."  This is significant for Asiryan's claims, because, according to Asiryan, the common law affords broader protections than the statute, which the Medical Staff denied her.

Asiryan points to authority that "where a statutory remedy is provided for a preexisting common law right, the newer remedy is generally considered to be cumulative, and the older remedy may be pursued at the plaintiff's election."  (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 79.)  As Asiryan acknowledges, however, this "general rule" does not apply where "it appears that the Legislature intended to cover the entire subject" of the statute via " 'general and comprehensive legislation.' "  (*Id.* at p. 80; see *Justus v. Atchison* (1977) 19 Cal.3d 564, 574 (*Justus*) ["[t]here are two alternatives: either the Legislature meant to deal with only the narrow issue specifically addressed in the statute, leaving to the courts the task of filling such gaps in the law as may remain; or it intended to regulate the entire question itself—to 'occupy the field'— thus cutting off all future judicial initiative"], disapproved of on other points by *Ochoa v. Superior Court* (1985) 39 Cal.3d 159 and *Shalabi v. City of Fontana* (2021) 11 Cal.5th 842; accord, *Environmental Law Foundation v. State Water Resources Control Bd.* (2018) 26 Cal.App.5th 844, 863–864.)

For at least two reasons, we conclude the California peer review statute is such general and comprehensive legislation " 'indicat[ing] a legislative intent that the statute should totally supersede and replace the common law dealing with the subject matter.' [Citation.]"  (*I. E. Associates v. Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 285 (*I. E. Associates*).)  First, the Legislature itself described the law as creating not just a handful of procedural

19

rights, but an entire medical "peer review *system*" for California. (See § 809, subd. (a)(2), italics added.) Our state Supreme Court and Courts of Appeal have accordingly characterized the statute as doing this as well, and in a " 'comprehensive' " manner. (*Natarajan v. Dignity Health* (2021) 11 Cal.5th 1095, 1103 (*Natarajan*) ["[w]hen the Legislature enacted the peer review statute in 1989, it both codified the peer review process and made peer review 'part of a comprehensive statutory scheme for the licensure of California physicians' "], quoting *Mileikowsky v. West Hills Hospital & Medical Center* (2009) 45 Cal.4th 1259, 1267 (*Mileikowsky*); accord, *Unnamed Physician, supra,* 93 Cal.App.4th at p. 616 [through the California peer review statute, "California chose to design a peer review system of its own"]; see also *Powell v. Bear Valley Community Hospital* (2018) 22 Cal.App.5th 263, 273 ["[t]he peer review process is codified at . . . section 809 et seq. and is a part of the 'comprehensive statutory scheme for the licensure of California physicians' required to be included in the medical staff bylaws of acute care facilities," fn. omitted].) The intent of creating a peer review system for California is most consistent with an "inten[t] to regulate the entire question [of medical peer review] itself—to 'occupy the field.' " (*Justus, supra*, 19 Cal.3d at p. 574; see also *McMillin Albany LLC v. Superior Court* (2018) 4 Cal.5th 241, 249 ["abrogation of the common law does not require an express declaration" to that effect].)[3] Asiryan argues that "the

_____

[3] Asiryan counters that "[t]here [is] no indication whatsoever of any Legislative intent to repeal the much broader common law right of fair procedure that applies to private organizations generally." (Italics omitted.) We agree, but whether the *entirety* of the common law of fair procedure survives the enactment of the California peer review statute is not the salient question for our purposes. Rather, we need only concern ourselves with the

reason for the enactment of [the California peer review statute] was to 'opt out' of the [HCQIA]."  This is a semantic distinction, because the Legislature stated its intent to opt out of the HCQIA *by creating California's own peer review system* in this particular factual context.  (§ 809, subd. (a)(2) ["[b]ecause of deficiencies in the [HCQIA] . . . it is preferable for California to 'opt-out' of the federal act and *design its own peer review system*," italics added]; § 809, subd. (a)(9)(A) ["California exercises its right to opt out of specified provisions of the [HCQIA] relating to professional review actions," "because the laws of this state provide a more careful articulation of the protections for both those undertaking peer review activity and those subject to review, and better integrate public and private systems of peer review"].)

Second, the " '[g]eneral and comprehensive' " (*I. E. Associates, supra*, 39 Cal.3d at p. 285) nature of the California peer review statute is evident in the detail with which it addresses the process required in connection with hospital peer review procedures. For the purposes of determining whether legislation replaces the common law, " '[g]eneral and comprehensive legislation' " is that in which " 'course of conduct, parties, things affected, limitations and exceptions are minutely described.' " (*Ibid.* [involving legislation on nonjudicial foreclosure of deeds of trust]; accord, *Pacific Scene, Inc. v. Peñasquitos, Inc.* (1998) 46 Cal.3d 407, 411 [involving legislation on corporate dissolution]; see *Justus, supra*, 19 Cal.3d at pp. 574–575 [involving legislation on recovery for wrongful

portion of this broad area of the common law addressing hospital peer review.  And the Legislature's stated desire to create a comprehensive peer review system reflects an intent to replace this portion of the common law.  (See *El-Attar, supra*, 56 Cal.4th at p. 988 [section 809 "codified the common law fair procedure doctrine in the hospital peer review context"].)

death]; *Flores v. Los Angeles Turf Club* (1961) 55 Cal.2d 736, 746 [legalized horse racing and wagering].)

This is the case with the California peer review statute, which methodically delineates specific and detailed procedural requirements for each step of a peer review proceeding.[4] (See *Natarajan, supra,* 11 Cal.5th at pp. 1103–1104 [summarizing several of these procedures].) These requirements address initial investigations and information sharing (§§ 809.05, 809.08); the notice of action and hearing rights (§ 809.1); voir dire of hearing

---

[4] For example, as to the hearing itself, the statute requires, inter alia, that "[t]he hearing shall take place before a trier of fact who is either (1) an arbitrator or arbitrators selected through a mutually acceptable process, or (2) a panel of fellow practitioners including, where feasible, a member who practices the same specialty as the physician. ( . . . § 809.2, subd. (a) . . . .) [¶] When the hearing is held before a peer review panel, a hearing officer may be appointed to preside. ( . . . § 809.2, subd. (b) . . . .) Unlike the members of the panel, the hearing officer need not be a medical practitioner; often the hearing officer is a lawyer. If a hearing officer is selected, the hearing officer is tasked with making procedural and evidentiary decisions, including ruling on requests for access to information, requests for continuances, and challenges to the impartiality of the panel members or hearing officer. ( . . . § 809.2, subds. (c)–(h).) The hearing officer may not, however, vote on the outcome; the ultimate decision is left exclusively to the panel. ( . . . §§ 809.2[, subd.] (b), 809.4, subd. (a)(1).) [¶] The statute provides that hearing officers and panel members alike 'shall gain no direct financial benefit from the outcome.' (§ 809.2[, subds.] (a) & (b).) The physician may question the panel members and hearing officer on voir dire, and has 'the right to challenge the impartiality of any member or hearing officer.' ( . . . § 809.2, subd. (c).) The hearing officer, if one has been selected, is responsible for ruling on such challenges." (*Natarajan, supra*, 11 Cal.5th at pp. 1103–1104, fn. omitted.)

panel members and officers (§ 809.2, subds. (a)–(c)); discovery rights (§ 809.2, subds. (d)–(f)); the manner in which the hearing shall be conducted, including the burdens of proof (§ 809.3, subds. (a)–(b)); and, finally, the parties' rights upon completion of the hearing (§ 809.4).  It would make little sense for the Legislature to so comprehensively address the issue of hospital peer review notice and hearings—down to such details as, for example, the composition of the hearing tribunal and specific timing requirements for notice—yet *also* intend for broad principles of fairness under the common law of fair procedure to provide for additional requirements.  (See *Flannery v. Prentice* (2001) 26 Cal.4th 572, 578 [in interpreting statutory language, a court must "avoid any construction that would produce absurd consequences"].)

Finally, the statute also commissions a study to develop recommendations for improving the "overall effectiveness and efficiency" of the "section 809 hearing process" (§ 805.2, subd. (c)(8); see § 805.2), which further supports that the Legislature intended legislative action informed by such studies, rather than the common law, to fill in any gaps that might exist in the statutory procedural guarantees.

In these ways, the Legislature's stated intent in enacting the California peer review statute—to create a comprehensive system for peer review of medical staff at hospitals and other medical facilities—and the detailed manner in which the statute creates such a system, are inconsistent with a view that the "Legislature meant to . . . leav[e] to the courts the task of filling such gaps in the law as may remain." (*Justus, supra*, 19 Cal.3d at p. 574.)  For these reasons, we conclude that the California peer review statute replaces, rather than supplants, the due process guarantees of the common law of fair procedure in

23

the specific factual context of the due process owed a licensed physician subject to peer review investigative and disciplinary actions.

## 2. *Asiryan's arguments to the contrary are unpersuasive*

In arguing to the contrary, Asiryan points to language in some cases describing the California peer review statute as " 'essentially' codif[ying]" the common law of fair procedure, and argues that use of the qualifier "essentially" leaves room for common law rights to supplement the statutory rights. As a threshold matter, our Supreme Court has referred to the statute as "codif[ying]" the common law in this context, without employing any qualifier. (*El-Attar, supra*, 56 Cal.4th at p. 988 ["[t]he Legislature subsequently codified the common law fair procedure doctrine in the hospital peer review context by enacting . . . sections 809 to 809.8 in 1989"].) More importantly, Asiryan's argument focuses on semantics and ignores that the reasoning and holdings of the cases in which such "essentially codified" language appear do not support Asiryan's position. Indeed, none of them even considers the intersection between the common law doctrine of fair procedure and the California peer review statute.[5] (See *Sahlolbei v. Providence Healthcare, Inc.* (2003) 112 Cal.App.4th 1137 (*Sahlolbei*) [discussed

---

[5] To the extent the use of the word "essentially" here is of any significance, the far more likely explanation in light of the case law and context in which the word appears is that the California peer review statute created many of the specific details for peer review due process procedures lacking in the general principles of the common law of fair procedure, but drew from those general principles, and in that sense "essentially" codified the common law in this context.

24

below]; *Weinberg v. Cedars-Sinai Medical Center* (2004) 119 Cal.App.4th 1098, 1106–1108; *id*. at p. 1108 [interpreting section 809.5, which "places a boundary on a [medical facility] governing body's role in the peer review process," and the appropriate level of deference the body must show to the decisions of bodies].) In one such case, *Sahlolbei, supra*, for example, although a physician's "complaint alleged in part that defendants had failed to provide him with a pretermination hearing as required by section 809.1 and the common law right of fair procedure" (*Sahlolbei, supra*, at p. 1155), the court analyzed this issue solely in terms of compliance with the plain meaning of the statute (*see id*. at pp. 1146–1152 & 1156).

That appellate decisions sometimes refer to the California peer review statute as setting forth "minimum" standards also does not imply a continuing role for the common law doctrine of fair procedure in the context of hospital peer review, as Asiryan suggests on appeal. (See, e.g., *El-Attar, supra*, 56 Cal.4th at p. 988 ["[t]hus, the peer review statute, like the common law fair procedure doctrine that preceded it, 'establishes minimum protections for physicians subject to adverse action in the peer review system' "], quoting *Mileikowsky, supra*, 45 Cal.4th at p. 1268.) The statutory requirements are "minimums" in the sense that "[t]he statute also permits hospitals to establish procedural protections above and beyond the minimum requirements specifically set out in the code"—not in the sense that other sources of California law require them to do more. (*El-Attar, supra*, at p. 988; accord, *Mileikowsky, supra*, at p. 1274; see § 809.6, subds. (a) & (b) ["[t]he parties are bound by any additional notice and hearing provisions contained in any applicable professional society or medical staff bylaws" and "any applicable agreement or contract between the licentiate and peer review body

25

or health care entity" that "are not inconsistent with" the specific procedures mandated by the code].)

Finally, we do not find persuasive Asiryan's argument that because some decisions discuss both the common law of fair procedure and statutory protections, or reference claims under both, the common law provides an independent source of additional protections. The California peer review statute created specific procedures in the context of hospital peer review that derive from the common law fair procedure right, so it stands to reason that courts will have occasion to discuss the latter in interpreting or applying the former. Some of the cases Asiryan cites do no more than this. (See, e.g., *El-Attar, supra*, 56 Cal.4th at p. 988 [discussing the history of the statute and the common law from which it partially derives in interpreting the statute].)

Nor do any of these cases address whether—let alone hold that—the common law of fair procedure is a source of additional procedural guarantees beyond what the statute provides in the context of hospital peer review. (See, e.g., *Sahlolbei, supra*, 112 Cal.App.4th 1137 [discussed above].) The primary case on which Asiryan relies in this regard—*Economy v. Sutter East Bay Hospitals* (2019) 31 Cal.App.5th 1147 (*Economy*)—involves a lawsuit in which the plaintiff purported to allege claims under both section 809.1 and the common law. (*Economy, supra*, at p. 1155.) But the issue presented in that case did not require the Court of Appeal to consider the extent to which the common law presented a viable, separate common law claim. Rather, the issue presented in *Economy* was whether the plaintiff physician's "statutory notice and hearing rights were . . . triggered [when] he was terminated by . . . his employer"—a hospital-affiliated entity that was not a " 'peer review body' " as defined by the statute—"and not by the hospital," its medical executive committee, or medical staff, all of which are

26

peer review bodies obligated to comply with the statute. (*Id.* at p. 1158.) The Court of Appeal agreed that the plaintiff physician's rights under the statute had been triggered, noting that to conclude otherwise would allow " 'a hospital [to] effectively avoid complying with the notice and hearing requirements of sections 805 and 809 by simply relying on its contracts with third-party employers as a way to terminate the services of physicians whenever a hospital administrator determines there is a medical disciplinary reason.' " (*Economy*, *supra*, at p. 1158.) In substance, *Economy* affirmed judgment for the plaintiff because the hospital had failed to comply with the hearing requirements *of the statute*—not any requirements imposed by the common law. Namely, it explained that, under the unique circumstances of the case, when the hospital-affiliated employer terminated the physician, the hospital's medical staff necessarily must have also revoked his privileges at the hospital, an act triggering statutory hearing and notice obligations, with which neither the hospital nor its staff had complied. (*Id.* at pp. 1158–1159.) On this basis, the court concluded that "the trial court [had] properly determined that the hospital violated [the] plaintiff's statutory and common law right to due process by substantially restricting his medical privileges without notice and a hearing." (*Id.* at p. 1160.)

In its statutorily-focused reasoning, the court notes in passing that "[m]oreover, a physician retains a common law right to fair procedure where the hospital's act significantly impairs the physician's practice of medicine. (*Potvin v. Metropolitan Life Ins. Co.* (2000) 22 Cal.4th 1060, 1072–1073 . . . [*Potvin*].)" (*Economy, supra*, 31 Cal.App.5th at p. 1159.) But the court does not state— nor did it necessarily imply, given the rest of the basis it provides for its holding—that this common law right extends beyond the procedures set forth in the California peer review statute. Nor do

27

we read the court's language in this regard as implying dicta so stating. Moreover, the sole case *Economy* cites for this proposition, *Potvin,* addresses the obligations of health insurers that are not covered by the California peer review statute, so the interplay between that statute and the common law was likewise not at issue in *Potvin*. (*Potvin, supra*, at p. 1072 [affirming judgment in which Court of Appeal had concluded the California peer review statute did not apply, and holding that under the common law of fair procedure, "when establishing standards for removal of physicians from its [health care insurer] preferred provider lists . . . such removal must be 'both substantively rational and procedurally fair' "].)

Thus, *Economy* neither considered, nor resolved any question necessarily involving, the question of whether the common law of fair procedure imposes additional due process rights on a hospital or its staff beyond those set forth in the California peer review statute.

### 3. *The court properly rejected Asiryan's jury instructions*

The trial court's rejection of Asiryan's special instructions presents an issue of law that we review de novo. (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.)

Asiryan argues in her opening brief that the court incorrectly rejected her "last amended proposed instructions" which were filed with the court on August 2, 2021. In her reply brief, she discusses the court's rejection of earlier proposed special instructions, which she filed in April 2021. Either set of instructions, however, provides an inaccurate summary of her notice and hearing rights under the California peer review statute and the common law of fair procedure, for the reasons set forth above. Specifically, all of these proposed instructions incorrectly state that the common law right

28

to fair procedure provides for a cause of action separate and apart from section 809.1, and this right entitles a physician to notice and a fair opportunity to be heard before a medical staff implements a summary suspension. The April 2021 instructions go one step further and state that the peer review statute also requires that a physician be informed of her notice and hearing rights at the time of a summary suspension.

Asiryan also argues the court incorrectly removed any "[d]iscussion of the *Economy* case" from the instructions, and that "[w]ithout this context as guidance, the jury was left to puzzle over the Medical Staff's sparse proposed instructions, which were permitted in full." But as discussed above, *Economy* does not support Asiryan's view of the case.

The court did not err in rejecting Asiryan's proposed instructions.

### 4. *The court properly granted a nonsuit on Asiryan's common law claim*

A defendant is entitled to a nonsuit where, as a matter of law, the evidence is insufficient to permit a jury to find in the plaintiff's favor. (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541.) Our review is de novo. (*Ibid.*) As discussed above, the court correctly concluded that the California peer review statute sets forth the exclusive source of peer review procedural protections Asiryan could claim. Therefore, the jury could not have found in her favor on the separate common law cause of action, and the court correctly granted the nonsuit.

### B. *The Court Did Not Reversibly Err in Denying Asiryan Leave To Amend To Add a Fraud Claim*

The denial of a motion for leave to amend is reviewed for abuse of discretion. (*Branick v. Downey Savings & Loan Assn.*

29

(2006) 39 Cal.4th 235, 242.) A lack of diligence in offering an amendment is grounds to deny a motion for leave to amend and is an "appropriate matter[ ]" for us to consider in evaluating the court's exercise of discretion. (*Roemer v. Retail Credit Co.* (1975) 44 Cal.App.3d 926, 939–940.) Despite the court suggesting multiple times in multiple pretrial conferences that Asiryan's case was more a misrepresentation case than a peer review case, Asiryan waited until the day before trial, after the jury had been impaneled, to announce she was "contemplating amending the complaint" to plead a claim for fraud. And Asiryan did not file her motion for another several days after that, nor did she raise the issue again until after both sides had rested their cases. Based solely on her lack of diligence in pursuing the desired amendment, the court acted within its discretion when it denied Asiryan leave to amend.

Even if the court had abused its discretion in denying leave to amend, however, any such error would not have been prejudicial. The jury specifically found that the Medical Staff had not misrepresented the staff's section 805 reporting obligations to Asiryan during the October 16, 2018 meeting. Because Asiryan's proposed theory of fraud was that this exact same purported misrepresentation fraudulently induced her to resign, even if she had been permitted to present her fraud claim, the jury would have rejected it.

The court did not reversibly err in denying Asiryan leave to amend her claim.

## C. *Attorney Fees*

### 1. *The court's ruling on attorney fees*

Following entry of judgment, the court granted GAMC and the Medical Staff's motion to recover attorney fees pursuant to the attorney fees provision of the California peer review statute,

30

section 809.9.  That section requires the court to "award to a substantially prevailing party the cost of the suit, including a reasonable attorney's fee, if the other party's conduct in bringing, defending, or litigating the suit was frivolous, unreasonable, without foundation, or in bad faith."  (§ 809.9.)

The court noted that "[m]uch attorney time was spent in attempting to bridge the contradiction in [Asiryan's] pleading: If the Medical Staff complied with [the statute] in placing [her] privileges on temporary suspension, how could it be liable for a denial of fair procedure at common law?  [Asiryan] eventually argued that section 809.5 was 'vague' and therefore the jury could amend it by imposing an additional notice requirement."  The ruling further notes that "[t]he litigation was also protracted by [Asiryan's] assertion that the action taken against her . . . had an anti-competitive motivation" when "[n]o credible evidence was provided for this accusation."

The court awarded two-thirds of the requested fee amount on the basis that defendants were entitled to fees for work on only two of the three causes of action.  Namely, the court concluded the defendants had not established a sufficient connection between Asiryan's claim for IIED and the peer review issues governed by the California peer review statute to justify an award of fees for work on the IIED claim.  The final award amounted to $237,938.25 to the Medical Staff and $84,867.75 to GAMC.

> **2.** ***The court erred in awarding attorney fees to the Medical Staff based on Asiryan pursuing a peer review theory the court had earlier deemed tenable***

Asiryan contends the court erred in concluding fees were appropriate under section 809.9, because her "conduct in bringing, defending, or litigating the suit" was not, as the statute requires,

31

"frivolous, unreasonable, without foundation, or in bad faith."
(§ 809.9.)  Whether an action is "frivolous," "unreasonable," or
"without foundation" under a statute authorizing an award of
costs or attorney fees presents a question of law we review de novo
where, as here, the pertinent facts are not in dispute.  (*Smith v.
Selma Community Hospital* (2010) 188 Cal.App.4th 1, 7 & 30–33
(*Smith*).)  In analyzing this issue, courts employ the objective
standard applicable to sanctions statutes, which looks to what a
hypothetical reasonable attorney would do under the circumstances.
(*Id.* at pp. 32–33 [in reviewing an award of attorney fees under
section 809.9, the court "conduct[ed] an independent review . . .
appl[ying] the any-reasonable-attorney standard as a matter of
law" and "[i]f the conduct in question meets this standard, then
the record also would contain substantial evidence supporting a
finding of fact that the conduct was reasonable"]; see *Mir v. Charter
Suburban Hospital* (1994) 27 Cal.App.4th 1471, 1485 ["[b]ecause
section 809.9 contains the same type of language as these other
[sanctions] statutes, it is more appropriately construed as a
sanctions measure specifically applicable to suits challenging
medical peer review decisions"].)  "[A] matter is frivolous if any
reasonable attorney would agree it is completely without merit in
the sense that it lacks legal grounds, lacks an evidentiary showing,
or involves an unreasonable delay."  (*Smith, supra*, at p. 33.)  "A
claim is factually frivolous if it is 'not well grounded in fact' and
it is legally frivolous if it is 'not warranted by existing law or a
good faith argument for the extension, modification, or reversal
of existing law.'  [Citation.]" (*Peake v. Underwood* (2014) 227
Cal.App.4th 428, 440 (*Peake*); *Smith, supra*, at p. 40 [approving
of section 809.9 analysis applying this definition].)  An action is
"without foundation" if there is no direct or circumstantial evidence
supporting the plaintiff's factual assertions, or if there is no statute,

regulation, case law, or other legal authority supporting the plaintiff's legal contentions. (*Smith*, *supra*, at pp. 30–31.) The terms "frivolous," "unreasonable," and "without foundation" partially overlap. To determine whether an action may be described by any one of them, a court must assess the grounds underlying the plaintiff's factual or legal positions and the reasoning process linking those grounds to the ultimate conclusions advocated by the plaintiff. (*See id.* at p. 33.)

Asiryan argues her section 809 claim against both the Medical Staff and GAMC was based on a reasonable extension of the principles set forth in *Economy*, because "*Economy* is authority for the proposition that attempts to indirectly and underhandedly circumvent the spirit of . . . section 809, while technically complying with the letter of the statute, provides a basis for a statutory action." (Italics omitted.) We disagree that *Economy* stands for this proposition, and instead interpret it as set forth in our discussion of that case above. (See Discussion *ante*, part A.2.) Indeed, we struggle to see *any* basis for Asiryan's peer review claims, as she did not establish the Medical Staff or GAMC failed to comply with any of the statutory requirements, and the common law cannot provide a source of additional common law guarantees.

This notwithstanding, we cannot fairly deem it unreasonable for Asiryan to have proceeded to trial with her peer review claims against the Medical Staff, given the court's earlier rulings rejecting defendants' efforts, via summary judgment and nonsuit motions, to dispose of the claims as inherently deficient.

In ruling on these motions, the court rejected challenges to Asiryan's peer review claims against the Medical Staff despite noting some of the same deficiencies it later relied on in granting the fee motion: that there existed no separate common law cause of action, and that the Medical Staff had complied with all the

statutory and notice requirements.  The court twice rejected the latter argument as a basis for disposing of the statutory claim, explaining that the court saw the possibility of a statutory claim against the Medical Staff based on the alleged misrepresentations to Asiryan regarding the Medical Staff's reporting obligations if Asiryan resigned as opposed to her being summarily suspended. Asiryan then proceeded to trial against the Medical Staff, arguing that "[t]his case is about hospital medical staff lying to and tricking [her] into giving up her rights to practice at a medical institution" which conduct "was a violation of both the letter and the spirit of . . . Asiryan's rights."

Of course, if the summary judgment or nonsuit motion were denied based on evidence later revealed to have been falsified or inaccurately described in connection with the summary judgment or nonsuit motions, a subsequent finding that the claims were unreasonable or without basis might be consistent with the claims having survived summary judgment.  (See *Rosenman v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro* (2001) 91 Cal.App.4th 859, 866 ["[W]e decline to establish a bright-line rule whereby a plaintiff who survives a motion for summary judgment or nonsuit can never be liable for attorney fees.  Such a rule would unjustifiably shield those plaintiffs who are able to raise a triable issue of fact . . . by means of fabricated evidence and false testimony.  If the false and unfounded nature of such a plaintiff's claims is revealed at trial, the prevailing defendant should be able to recoup its attorney fees"].)  But the court did not find that Asiryan falsified or mischaracterized evidence, nor do defendants argue she did.

Here, the court expressly permitted Asiryan to move forward with her peer review claims against the Medical Staff on a theory focusing on the Medical Staff misrepresenting its reporting

34

requirements.  The court also repeatedly expressed skepticism about this legal theory.  But precisely *because* the court expressed skepticism about the legal viability of Asiryan's peer review claims against the Medical Staff, yet denied motions to dispose of them on this basis, a hypothetical reasonable attorney could conclude that the claims were " 'warranted by . . . a good faith argument for the extension, modification, or reversal of existing law' " (*Peake, supra,* 227 Cal.App.4th at p. 440; see *Smith, supra*, 188 Cal.App.4th at p. 39) and were thus tenable.

The same is not true regarding Asiryan's claims against GAMC.  The trial court correctly granted summary judgment in GAMC's favor on those claims, ruling that GAMC had not taken any of the actions that Asiryan alleged reflected violations of the common law and California peer review statute.  Moreover, for the reasons discussed above, we reject Asiryan's contention that *Economy, supra*, 31 Cal.App.5th 1147, provides a basis for extending either body of law to nevertheless support a tenable claim against GAMC based on the Medical Staff's actions.

We therefore reverse the fee order to the extent it awards fees to the Medical Staff.

## DISPOSITION

The judgment is affirmed.  The order awarding attorney fees is reversed to the extent it awards the Medical Staff fees and costs. The parties shall bear their own costs on appeal.


ROTHSCHILD, P. J.

We concur:



CHANEY, J.



WEINGART, J.

36

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| VARDUI ASIRYAN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>MEDICAL STAFF OF GLENDALE ADVENTIST MEDICAL CENTER,<br><br>    Defendant and Respondent. | B316313<br>(Los Angeles County<br>Super. Ct. No. 19STCV02196) |
| VARDUI ASIRYAN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>GLENDALE ADVENTIST MEDICAL CENTER et al.,<br><br>    Defendants and Respondents. | B317728<br>(Los Angeles County<br>Super. Ct. No. 19STCV02196)<br><br><br>CERTIFICATION AND ORDER FOR PUBLICATION |

THE COURT:

    The opinion in the above-entitled matter filed on February 29, 2024 was not certified for publication in the Official Reports. For

good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____
ROTHSCHILD, P. J.      CHANEY, J.      WEINGART, J.